Karla Renea REAVES, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–96–01006–CR.

Court of Appeals of Texas, Dallas.

May 14, 1998.

Russell P. Brooks, Greenville, for Appellant.

Noble D. Walker, Jr., Assistant County Attorney, Greenville, for State.

Before THOMAS, C.J., and FARRIS[1] and MILLER,[2] JJ.

## OPINION

CHUCK MILLER, Justice (Retired).

Appellant Karla Renea Reaves was charged by indictment with the offense of murder. She entered her plea of not guilty, the case went to trial before a jury, and at the conclusion of the guilt stage, the jury found her guilty of the lesser included offense of voluntary manslaughter. The jury also heard the punishment phase of the trial and, after hearing additional punishment evidence, assessed Reaves's punishment at two years' confinement in the Institutional Division of the Texas Department of Criminal Justice. On appeal, Reaves brings four points of error. In the first three points, she challenges the legal and factual sufficiency of the evidence to support the jury's verdict and implied finding against her legal defense. In the fourth point, Reaves maintains the trial court committed reversible error in admitting evidence of extraneous matters in the guilt stage of the trial. We affirm.

Karla Reaves was indicted for the murder of Larry Reaves, her husband. The evidence produced at trial showed that Larry Reaves

---

1. The Honorable David F. Farris, Former Justice, Second District Court of Appeals, Fort Worth, Texas, sitting by assignment.

2. The Honorable Chuck Miller, Judge, Texas Court of Criminal Appeals, Retired, sitting by assignment.

was shot with a firearm in the Reaveses' home on April 7, 1994, in Hunt County. On that date, Hunt County Deputy Neil Dent arrived at the Reaveses' residence to find Karla sitting on the front porch, crying. When Karla told Dent that Larry was inside, Dent went in and discovered Larry, dead and lying on his back as if he had just fallen backwards. There was one apparent gunshot wound in the chest area and another wound to the shoulder that was less obvious. A pistol was on the bed in a front room. Dent returned to Karla on the front porch and Karla told Dent that she had shot Larry twice. Karla was very upset and could not converse much more than that. Photographs taken at the scene showed Larry prone, on his back, fully clothed, with his outer shirt raised at its bottom slightly toward the upper part of his trunk.

Dr. Irving C. Stone conducted the autopsy on Larry. His autopsy report showed the cause of death to be two gunshot wounds. Larry was shot once in the left shoulder, and the holes in his jacket and in his shirt corresponded to the bullet hole in his body. That is, all three holes lined up when the jacket and shirt were in a normal position on a body that was erect. Larry was also shot once in the chest, but the holes there did not match up in the same way. The hole in the jacket was five to six inches higher than the hole in the shirt, while the holes in the shirt and in the body lined up when the shirt was in a normal position on a body that was erect. The holes in the chest area were consistent with a shot fired at a body on the ground whose jacket had been thrown back or up slightly by an abrupt fall backwards to the ground. In fact, the State espoused the theory that Karla fired a shot into Larry as he lay on the ground after being shot in the shoulder. Dr. Stone added that, in his opinion, Larry was not facing Karla at the time the shot that entered his shoulder was fired.

A second medical expert, Dr. Joseph Guillardo, testified for the State and explained that, assuming Karla was standing as she fired, the shoulder wound could only have been received if Larry had been leaning down towards her; the wound was not consistent with a shot fired as Larry walked toward Karla. In fact, his reconstruction of the path of the two bullets, based on their angles of entry into the body, did not match the rendition of events presented by any of the defense witnesses.

Also, in direct contravention to defense evidence that was to follow, Margene Allen, a 911 dispatcher for the sheriff's office, testified that Karla called Dent, who told Karla to call 911. Dent thereafter asked Allen to call Karla. Allen's first call to Karla was answered by a man who hung up on her. Allen called back and spoke with Karla. Karla asked that Allen send an officer. The call was disconnected and Allen called back. The phone was answered and Allen was able to hear yelling, screaming, and loud scuffling as if Larry were hitting Karla. Allen remembered hearing children crying. Allen heard Karla order Larry to stop and then a gun shot. Allen immediately radioed officers on duty that a shot had been fired. Returning to the phone, Allen heard more of a scuffle and children crying before the phone went dead. Allen's return calls were met with a busy signal. The tape of the 911 calls was not preserved for trial.

Over objection, the State was allowed to introduce evidence that Karla had been in an adulterous affair with another man for almost two years during the time leading up to the shooting and was living with that man at the time of trial. There was no evidence introduced that Larry was aware of the affair. The State sought to introduce evidence of the affair to show motive and to counter any claim of self-defense. The State argued that, with Larry out of the way, Karla could engage in her affair openly and without fear of retribution from Larry.

Karla testified in her defense. She readily admitted shooting Larry in order to stop him from advancing toward her. She told of the events of the day, beginning with Larry being drunk, angry, and violent at home. Larry was apparently angry at Karla's father for something that had happened earlier in the day. Sometime after 9 p.m., the argument reached such a level that Karla's son, Kenny, summoned Karla's parents, Kenneth and Helen Dodd, to the Reaveses' home because of Larry's erratic behavior. The Dodds, who

lived close by, quickly arrived and various scuffles broke out between Larry and Karla and between Larry and the Dodds. Initially, Karla asked her parents, who were at the back door, to leave and get Dent because Larry was mad. Larry then pushed past Karla and pushed Kenneth into a dryer in the yard. Karla got her gun from their van, held it behind her back, and went inside where her mother had Dent on the phone. Dent advised Karla to call 911, and she did so. Larry then came back into the house and told the 911 operator that no help was needed. The 911 operator, later identified as dispatcher Allen, called back and, while Karla was giving her directions to the house, Larry grabbed the phone, yelled into it, and ripped it from the wall. There was only the one phone in the house. Larry then wrapped his arms around Karla from the front, in an attempt, according to Karla's testimony, to get the gun she was holding behind her back. While she struggled with Larry for control of the gun, both of Karla's parents grabbed Larry, but he threw them back. Again, Karla's parents grabbed Larry, who was still battling with Karla over the gun, and Larry threw them into a chair. Karla testified that Larry then advanced on her and that she shot him one time. Larry stepped back and then advanced again. Karla testified that Larry was coming straight toward her and she fired a second shot. Larry fell to the floor. Karla testified that she believed, because of his rage, if Larry had gotten the gun he would have killed her, their two children, and then himself. Karla had never seen Larry like this before. She admitted on cross-examination that Larry never threatened her verbally during the altercation, never hit her with his fist, and never tried to choke her or grab at her neck. Larry also did not verbally threaten anyone's well-being that night. She further admitted that she never tried to retreat.

The Dodds testified in favor of their daughter's rendition of events. Prior to the day of the shooting, the Dodds had enjoyed a good relationship with Larry. There had never been any assaultive conduct between them. In fact, Kenneth testified that Larry was "the son I never had." The Dodds knew of no history or incidents of spousal abuse in their daughter's marriage. Their detail of the continuing scuffle with Larry as he was trying to get Karla's gun was even more graphic than hers. At one point before Karla retrieved the gun and just after Kenneth arrived, Larry pushed and shoved Kenneth around outside the house. Larry, however, never struck or hit Karla, Kenneth, or Helen with his fist, nor did he ever threaten them verbally. Kenneth testified that after Karla returned inside with the pistol, Larry wrapped his arms around Karla in an aggressive manner. Kenneth admitted on cross-examination, however, that this was done in a manner and under circumstances consistent with an attempt to get the gun from her. Karla was, in Kenneth's words, hysterical as she fired both shots and then ran out the door. Helen summoned Dent immediately after the shooting.

The defense called additional witnesses to prove numerous instances of physical abuse Karla had suffered at the hands of Larry, including a broken arm within a year prior to the shooting.

In argument, the State's theory was that Karla knowingly and intentionally shot Larry, that Larry did not threaten her or the Dodds with deadly force, that Karla did not harbor a *reasonable* expectation or fear of death or serious bodily injury, and that there was no adequate cause for her emotional state that would justify a voluntary manslaughter verdict. Larry, in the State's view, was only trying to get the gun from Karla, and Karla shot him in the shoulder and, after he fell, shot him again as he lie on the ground. Karla's defensive theories included self-defense and defense of a third person.

Karla was indicted for murder under the law in effect at the time of the offense. That law provided, in pertinent part:

§ 19.02. **Murder**

(a) A person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual....

Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 913, *amended by* Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws 1122, 1123 (subsequent amendments not listed)

(current version at TEX. PENAL CODE ANN. § 19.02 (Vernon 1994)).

The jury was charged on the law of murder and, at Karla's request, the lesser included offense of voluntary manslaughter.

### § 19.04. Voluntary Manslaughter

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 913, *amended by* Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws 1122, 1124 (subsequent amendments not listed) (current version at TEX. PENAL CODE ANN. § 19.04(a) & (b) (Vernon 1994)).

In addition to the lesser-included offense, Karla requested and received instructions on self-defense and defense of a third person. As stated above, the jury returned a verdict of guilty to the offense of voluntary manslaughter.

■ In point three, Karla challenges the factual sufficiency of the evidence to defeat her defenses of self-defense and defense of a third person. In reviewing a challenge to the factual sufficiency of the evidence, the appellate court must consider and weigh all of the evidence without the prism of "in the light most favorable to the prosecution." *See Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim.App.1996). We consider all of the evidence in the record related to an appellant's sufficiency challenge, comparing the weight of the evidence that tends to prove guilt with the evidence that tends to disprove it. *See*

*Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim.App.1997). However, appellate courts should only exercise their fact jurisdiction to prevent a manifestly unjust result. They are not free to reweigh the evidence and set aside a jury verdict merely because the judges believe that a different result is more reasonable. *See Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997); *Clewis*, 922 S.W.2d at 135. The court of criminal appeals stated in *Clewis:*

> The appropriate balance between the jury's role as the judge of the facts and the reviewing court's duty to review criminal convictions is struck by *not* allowing the appellate court to "find" facts, or substitute its judgment for that of the jury; rather, when it determines that the verdict is against the *great* weight of the evidence presented at trial so as to be *clearly wrong and unjust*, it must reverse the verdict and remand for a new trial.

*Clewis*, 922 S.W.2d at 135.

■ This case involves a challenge to the factual sufficiency of the evidence to support the jury's rejection of Karla's defensive theories of self-defense and defense of a third person. On appeal, where a defensive issue under chapter nine of the penal code was submitted to the jury and a challenge to the *legal* sufficiency of the evidence admitted to rebut the defensive issue is made, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also whether any rational trier of fact would have found against appellant on the defensive issue beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App.1991).

Further, the court of criminal appeals has set the standard for *factual* sufficiency review in cases where the defendant has asserted an *affirmative* defense or otherwise has the burden of proof on another fact issue. *See Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Crim.App.1990). When a defendant asserts an affirmative defense or otherwise has the burden of proof on an issue, a *reviewing court considers all the evidence and determines whether the judgment is so against the

great weight and preponderance of the evidence as to be manifestly unjust. *See id.*

In this case, Karla asserts a factual sufficiency challenge where the State had the burden of proof. Thus, it does not fit squarely within the holding of *Meraz* or *Saxton. See Id.; Saxton,* 804 S.W.2d at 914. Although neither party cites us to a case containing the proper standard of review to be used in the particular case at hand, we believe that the correct course of appellate review is to merge *Clewis*'s holding concerning factual sufficiency with the holding in *Saxton* concerning a legal sufficiency challenge involving a penal code defense. *See Clewis,* 922 S.W.2d at 129; *Saxton,* 804 S.W.2d at 914. Therefore, in determining this challenge to the sufficiency of the evidence to support the jury's finding, beyond a reasonable doubt, against Karla's self-defense issues, we will consider all of the evidence in the record probative of Karla's guilt and also all of the evidence in the record probative of her self-defense issues and decide if the finding of guilt, beyond a reasonable doubt, and the implied finding against the self-defense issues, beyond a reasonable doubt, are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Clewis,* 922 S.W.2d at 128–29; *Saxton,* 804 S.W.2d at 914.

■ The correct measuring stick against which the evidence must be compared in a challenge to the sufficiency of the evidence is a "hypothetically correct charge," not the jury charge actually given. *See Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). Although *Malik* involved a challenge to the legal sufficiency of the evidence, we discern nothing in the opinion that limits its holding to that category of sufficiency challenges. *See id.* Thus, we will examine the evidence in this case without the prism of "in the light most favorable" to the guilty verdict to see if the finding of guilt, beyond a reasonable doubt, and the implied finding against the self-defense issues, beyond a reasonable doubt, are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Clewis,* 922 S.W.2d at 128–29; *Saxton,* 804 S.W.2d at 914.

■ The State does not contend that the trial court's charge to the jury was improper. The charge correctly incorporates the law of self-defense as contained in the penal code. *See* Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 901 (subsequent amendments omitted) (current version at TEX. PENAL CODE ANN. §§ 9.31–9.34 (Vernon 1994 & Supp.1998)). We will thus use the trial court's charge in our analysis under this point. The charge, in pertinent part, reads as follows:

Upon the law of self defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force.

A person is justified in using deadly force against another if he would be justified in using force against the other in the first place, as above set out, and when he reasonably believes that such force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force, and if a reasonable person in defendant's situation would not have retreated.

A person is justified in using force or deadly force against another to protect a third person if, under the circumstances as he reasonably believes them to be, such person would be justified in using force or deadly force to protect himself against the unlawful force or deadly force of another which he reasonable [sic] believes to be threatening the third person he seeks to protect, and he reasonably believes that his intervention is immediately necessary to protect the third person.

By the term "deadly force" is meant force that is intended or known by the person using it to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.

"Bodily injury" means physical pain, illness, or any impairment of physical condition.

"Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious perma-

nent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

By the term "reasonable belief," as used herein, is meant a belief that would be held by an ordinary and prudent person in the same circumstances as defendant.

When a person is attacked with unlawful deadly force, or he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack, and it is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to his [sic] from him [sic] standpoint at the time, and that he reasonably believed such force was immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force....

You are further instructed that in determining the existence of real or apparent danger, it is your duty to consider all the facts and circumstances in evidence in the case before you and consider the words, acts and conduct, if any, of LARRY ALLEN REAVES at the time of and prior to the time of the alleged killing, if any, and in considering such circumstances, you should place yourselves in the defendant's position at that time and view them from her standpoint alone....

█ In addition to the court's charge, we note that mental states may be inferred and proven from acts done, words spoken, and the surrounding circumstances. *See Ledesma v. State*, 677 S.W.2d 529, 531 (Tex.Crim. App.1984). Intent, in particular, is often shown to a jury from acts done, words spo-

ken, and conduct of the accused at the time of the offense. *See Dues v. State*, 634 S.W.2d 304, 305 (Tex.Crim.App. [Panel Op.] 1982).

Turning to the evidence in the case at bar, it was uncontested that Karla killed Larry. The only question, under this point, is whether she was justified in doing so. Under the evidence summarized above, Karla, her mother, and her father were the only eyewitnesses to the altercation who testified. Standing alone, their testimony could be considered a convincing story of both self-defense and defense of a third person. However, the two medical experts' testimony directly contradicted the three defense witnesses' claim that Karla shot Larry twice as Larry was walking towards her. The medical experts had no apparent motive to be less than truthful about unalterable physical evidence, studied in calm, scientific reflection. Allen, the dispatcher, also had no apparent motive to shade the truth. She testified that, as a 911 dispatcher, she had heard gunshots during 911 calls on three occasions. Thus, this would seem to be an experience that would stand out in her mind. Her recollection of events seems to support the State's theory of the case, that the second shot to Larry's chest was fired by Karla as she stood over her wounded husband.

There was an obvious, unexplained conflict in testimony, backed by strong, often emotionally charged, evidence from each side. In our view, the two versions of events could not be reconciled; nor did either side urge the jury to do so. The jury could only resolve the disputed versions by choosing between them.

The jury is the sole judge of the weight of the evidence and may choose to find credible all, some, or none of it. *See Cain v. State*, 958 S.W.2d at 408–09; *Moore v. State*, 935 S.W.2d 124, 126 (Tex.Crim.App.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1711, 137 L.Ed.2d 835 (1997). Because the jury is the sole judge of weight and credibility of the witnesses, it may accept or reject any or all testimony of any witness. *See Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex.Crim.App. 1995). Again, our role is not to "find" facts; rather, it is to see if we can determine that

the verdict is against the *great* weight of the evidence presented at trial so as to be *clearly wrong and unjust.* *See Clewis,* 922 S.W.2d at 135.

Considering all of the evidence, measuring it against the charge (here, correctly given), and giving due deference to the role of the jury as fact finder, we cannot say that the finding of guilt, beyond a reasonable doubt, and the implied finding against the self-defense issues, beyond a reasonable doubt, are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.; Saxton,* 804 S.W.2d at 914. Point three is overruled.

■ In points one and two, Karla challenges the legal and factual sufficiency of the evidence to support a finding of guilt for the offense of voluntary manslaughter. Such a challenge is barred by principles of estoppel because Karla sought the charge on the lesser included offense. *See Bradley v. State,* 688 S.W.2d 847, 853 (Tex.Crim.App.1985). In *Bradley,* the court of criminal appeals clearly stated:

We hasten to add that this disposition of the case [reversal due to insufficient evidence of sudden passion] hinges on the fact that appellant vociferously objected to the inclusion of the voluntary manslaughter charge. Failure to object to the charge when given on the ground that the evidence does not support it would signal acquiescence on the part of the accused in the trial court's judgment that sudden passion was raised.

By invoking the benefit of the lesser included offense charge at trial in not objecting to its submission to the jury, an accused will be estopped from then complaining on appeal that the evidence failed to establish all the elements of the offense.

*Id;* *see also Grant v. State,* 950 S.W.2d 450, 450–51 (Tex.App.—Beaumont 1997, pet. ref'd).

■ Moreover, we have reviewed the legal and factual sufficiency of the evidence and conclude that, germane to points one and two, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering the evidence in the light most favorable to the verdict. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Bowers v. State,* 570 S.W.2d 929, 932 (Tex.Crim.App.1978). We further conclude, again germane to points one and two, that the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, considering all of the evidence and weighing it without the prism of "in the light most favorable to the prosecution." *See Clewis,* 922 S.W.2d at 129. Points one and two are overruled.

■ In point four, Karla complains the trial court erred in allowing the State to introduce evidence of her extramarital affair. As stated earlier, the State sought to introduce this evidence to show motive to kill; that is, to show that Karla had a reason to murder her husband and claim self-defense in order to be free of the marriage and to pursue her relationship with another man. In the common experience of mankind, this is an oft repeated motive for homicide. The trial court was asked to and did rule according to the process outlined by the court of criminal appeals in *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g). That process calls for a trial judge to make a rule 401 relevancy determination, by inquiring of himself whether a reasonable person would believe that the particular piece of evidence is helpful in determining the truth or falsity of any fact that is of consequence. *See* TEX.R.CRIM. EVID. 401;[3] *Montgomery,* 810 S.W.2d at 386. If relevant to some issue of consequence in the case, evidence is ordinarily admissible and should only be excluded if the trial court finds, in a second inquiry, that the probative value of the evidence is substantially outweighed by (1) the prejudicial effect, (2) the possibility of confusing or misleading the jury, or (3) considerations of delay or presentation of cumulative evidence. *See* TEX.R.CRIM. EVID. 403; *Montgomery,* 810 S.W.2d at 389. Further,

---

**3.** Effective March 1, 1998, the Texas Rules of Criminal Evidence and Texas Rules of Civil Evidence were merged into the new Texas Rules of Evidence. Because this case was tried before the effective date of the new rules, we will apply the former Texas Rules of Criminal Evidence.

the burden to show exclusion is on the opponent of the evidence once the proponent shows relevancy. *See Montgomery,* 810 S.W.2d at 389.

For our purposes, *Montgomery* additionally held that appellate courts should give great deference to these decisions, even to the extent that trial courts are given a limited right to be wrong as long as their decision is not "arbitrary and capricious." *See id.* at 380. A trial court's ruling on admissibility should not be disturbed simply because an appellate court might decide a question differently than the trial court. *See id.* As long as the trial court's ruling is within the "zone of reasonable disagreement," an area where reasonable persons might disagree over what the ruling should be, the trial court's ruling should not be disturbed on appeal. *See id.* at 391.

Following the dictates of *Montgomery,* we conclude that the trial judge's decision in this case was, at least, within the "zone of reasonable disagreement." *See id.* Whatever prejudicial effect evidence of an extramarital affair may have in this case, such evidence had, in common human experience, a rational relationship to the State's theory of the case. At best, it can be said that reasonable minds might disagree about whether any prejudice from this evidence substantially outweighed its probative value. Therefore, following *Montgomery,* we decline to hold that the trial court abused its discretion in conducting the rule 401 and 403 analysis as it did, and, thereafter, allowing the evidence of Karla's extramarital affair to be admitted. *See id.* Point four is overruled.

The judgment of the trial court is affirmed.