Criminal Case Template












COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



NORMA BUSTILLOS,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.

§


§


§


§


§

No. 08-01-00467-CR


Appeal from the


409th District Court


of El Paso County, Texas


(TC# 980D00348)



M E M O R A N D U M O P I N I O N



 Appellant was charged by indictment for the offense of capital murder. This is an
appeal from a jury conviction for the lessor-included offense of criminally negligent
homicide. The court assessed punishment at two (2) years' confinement in a Texas State Jail
Facility and a $10,000 fine. We affirm the judgment of the trial court.

I. SUMMARY OF THE EVIDENCE


 The record in the instant case shows that on the morning of November 16, 1997, two
hunters found an abandoned infant wrapped in a white towel behind some brush near an
unpaved levee road located in the outskirts of El Paso near Canutillo, Texas. Both hunters
testified that the first freeze of the year had occurred overnight. The infant was cold and
unresponsive to the touch. The two men drove their truck for help. They flagged down
Stephen Haack, a deputy with the El Paso County Sheriff's Department. Haack followed the
two men back to the infant's location. When Haack opened the white towel, he found her
in a fetal position with part of the umbilical cord attached, and covered in afterbirth. There
were no signs of life. The infant had what appeared to be human hair clutched in her hand. 
The infant was taken to the El Paso County Medical Examiner's office for an autopsy. 

 On January 12, Detective James Reuter of the El Paso County Sheriff's Department,
received a call from an individual who indicated that Appellant might be a suspect in the
case. The next day Reuter and Detective Onesimo Esparza went to Marisa Escobar's trailer
home where Appellant was staying. Inside the trailer in a bedroom, they observed apparent
blood stains on the wall and a door frame and some stains on the carpet that appeared as if
someone tried to clean the carpet with bleach. 

 Several hours later, Bustillos and Victor Romero, Appellant's boyfriend, arrived at
the trailer. Both consented to go to the police station. At the station, Appellant gave the
following statement:

 I became pregnant with my boyfriend's child around February 1997. I was
living with my father, Manuel, and my stepmother Clara Escalera. Also living
there, at 110 Ashtray Road, were my stepmother's children. My brother
Danny, would come and visit now and then. I moved to my sister's house at
7840 Kiely Road #25, sometime in late August 1997. I moved there because
she was also expecting a baby and to help take care of her two other boys. On
09-20-97, the whole family attended my brother Manny's wedding. During the
wedding reception, my father Manuel, had been drinking and started crying. 
My brother Manny told me that someone had told my father that I was
pregnant. My boyfriend, Ismael Romero, knew I was pregnant. On 11-15-97,
I was at my sister's house by myself. My sister and her husband and the
children went to visit some relatives in Juarez. I called Ismael. Ismael came
to my sister's house around 5:00 p.m. He stayed for about fifteen minutes,
then left. He told me that if I needed anything to call him. I had felt bad all
day long. After Ismael left I went and took a shower. I had taken some
painkillers earlier. After my shower I went into the bedroom next to the
bathroom and laid down on the bed. I was having a lot (sic) of pain. I got up
from the bed and stood. The baby just came out, and fell to the floor. I just
stood there shocked. Initially, the baby was crying. I had a towel wrapped
around me from the shower. I picked the baby up from the floor and wrapped
the baby in the towel. I then placed the baby on the bed. When I placed the
baby on the bed she was not crying any longer. I sat on the bed for awhile next
to the baby. I didn't know what to do. I remembered my brother in law (sic)
Jesus telling me that the car was there if I needed it. I got dressed. I cleaned
the baby alittle (sic). I carried the baby to the car and placed the baby on the
front seat. The baby was still and not moving. I drove off from my sister's
and really do not know where I went. I remember crossing a bridge and then
turned left right after the bridge. I drove down that road a little then made a
U-turn and stopped the car. I got out of the car and carried the baby across a
ditch and placed the baby in some brush. I went to the car and sat there
awhile. I was very dizzy and that started in the afternoon. I was still dizzy. 
I went back to my sister's house. I stayed outside for a little while. I then
went inside the trailer and sat on the couch where I sleep. I was bleeding quite
a lot (sic). I went to the restroom and threw-up (sic). I sat there for awhile. 
I tried to clean up the bedroom before I left the trailer. I then went into the
first room. I had a small puppy that Ismael gave me. I let him out and he went
to the couch where I sleep. I went to the couch and later fell asleep. Later, my
sister and her husband came home. I had locked the door. I heard them knock,
I got up and opened the door. I sat on the couch with my nephews for a few
minutes and talked with them. I told my sister as she was walking toward the
back of the trailer that I had gotten sick and threw-up (sic) blood in the room. 
Neither my sister or her husband questioned what I told them. I never told
them that I was pregnant. I really didn't show very much throughout my
pregnancy. 


 As a result of this statement, Reuter placed Appellant under arrest for the murder of
the abandoned infant. 


 Three medical experts testified at trial. The first expert to testify was Dr. Juan Contin,
the pathologist who performed the autopsy on the infant. Contin testified that the cause of
death was hypothermia due to cold weather exposure. Contin stated, "The child was exposed
to a low temperature and I concluded that the cause of death was hypothermia." Contin also
stated that the infant was alive after her birth because he found air in her stomach and
intestines. He testified that a newborn child wrapped in a towel and left out in the freezing
night would become unconscious fairly quickly. Contin speculated that it would take from
one-half hour to an hour to die. If the infant were wet, death could occur sooner. 

 When Contin was cross-examined, he agreed with the defense that the infant could
have died of hypothermia inside an unheated mobile home. (1) With hypothermia, death would
be accelerated in freezing temperatures if the infant was wet and if the infant had been
wrapped in a wet towel. 

 Dr. Harry Wilson, a pediatric pathologist, assisted Dr. Contin with the autopsy. 
Wilson prepared some slides from the infant's brain tissue. When he viewed the slides
microscopically, he found the presence of red neurons in her brain. Wilson stated that these
neurons develop when damaged brain nerve cells degenerate as a result of lack of oxygen to
the brain. If a person is alive while this damage is occurring, the damaged nerve cells
become red neurons. If the subject dies immediately after the damage occurs, red neurons 


would not develop. Wilson testified that in the case of an infant, the child would have to be
alive for a minimum of four hours for the red neurons to develop. 

 Wilson testified that it was possible that the infant suffered some type of asphyxiation
before she was exposed to the cold thereby causing the nerve cell degeneration. The
presence of red neurons indicated that the infant was alive for at least four hours in the
deprived oxygen state for the red neurons to develop. 

 Wilson also testified that the glycogen stores found in the infant's liver had just begun
to show depletion. This process begins four hours after an infant is born. Therefore, Wilson
estimated that given the development of red neurons, and the state of the glycogen depletion,
the infant had lived approximately four hours after birth. He also stated that the infant's
hypothermia could have been reversed if she had received prompt medical care. During
rebuttal testimony for the State, Wilson provided a presentation in the courtroom where he
examined the slides microscopically, and pointed out the presence of the red neurons. 

 During the defense presentation, Dr. Contin was called to the stand as a defense
witness. Contin testified that he reviewed slides of the infant's brain tissue two days prior
to his testimony, and he did not see any red neurons. During cross-examination, he stated
that he had no greater ability than any other doctor to identify red neurons. 

 Appellant called Dr. Corine Stern as a defense witness. She testified that she was the
chief medical examiner for El Paso County. She reviewed Dr. Contin's autopsy report and
reviewed the slides that had been made from the infant's brain tissue. Stern stated that she
did not see the presence of red neurons. She testified that there was no forensic basis in
quantifying the amount of glycogen depletion in the liver in order to determine a time of
death for an infant. Stern testified that the cause of death could not be definitely determined. 
She stated that the infant could have died from natural causes from being born unattended. 
Stern also testified that the infant could have died from hypothermia as a result of being born
in a cold trailer. She stated that an infant can die of hypothermia at room temperature unless
protective measures are taken. 

 Stern was called again by the defense as a rebuttal witness. She reiterated that she
disagreed with Dr. Wilson's testimony concerning the presence of red neurons. Stern stated
that she detected the presence of dying neurons in the infant's brain tissue. However, Stern
testified that dying neurons should not be confused with red neurons. She also related that
it takes ten to twenty-four hours to see red neurons after an hypoxic event in the brain.

 Prior to the commencement of the voir dire, Appellant filed an election to have the
jury assess punishment. At the charge conference prior to commencement of the punishment
stage of trial, Appellant moved to change her election and to proceed to the court for
punishment in order to allow Appellant to be eligible for community supervision. The State
objected to the change of election and the court denied Appellant's motion. Appellant
objected to this denial on the grounds of ineffective assistance of counsel as well as due
process and equal protection grounds. The court overruled these objections. 


 After the jury returned its punishment verdict of two (2) years' state jail confinement
and a $10,000 fine, Appellant was sentenced. Subsequent to the sentencing, Appellant filed
a motion requesting suspension of her sentence. The court held that it had the authority to
suspend a jury's sentence in a state jail felony and scheduled a hearing regarding the issue
of community supervision. At this hearing, Appellant presented the testimony of a forensic
psychologist who gave the opinion that Appellant did not exhibit indications that she was a
threat to the community or a danger to society. After hearing the evidence, the court denied
Appellant's motion requesting suspension of the sentence. 

II. DISCUSSION


 Appellant presents two issues on appeal. First, she asserts that the evidence was
legally and factually insufficient to support the conviction. Secondly, she maintains that
Article 42.12(4) of the Code of Criminal Procedure violates the equal protection clause of
the United States Constitution.

 Regarding the legal sufficiency of the evidence, we are constrained to view the
evidence in the light most favorable to the judgment to determine whether any rational trier
of fact could find the essential elements of the offense, as alleged in the application
paragraph of the charge to the jury, beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Butler v. State, 769 S.W.2d 234, 239 (Tex. Crim.
App. 1989); Humason v. State, 728 S.W.2d 363, 366 (Tex. Crim. App. 1987). More
particularly, sufficiency of the evidence should be measured by the elements of the offense
as defined by the hypothetically correct jury charge for the case. Malik v. State, 953 S.W.2d
234, 239-40 (Tex. Crim. App. 1997).

 Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable
doubt. Stoker v. State, 788 S.W.2d 1, 6 (Tex. Crim. App. 1989), cert. denied, 498 U.S. 951,
111 S.Ct. 371, 112 L.Ed.2d 333 (1990); Dwyer v. State, 836 S.W.2d 700, 702 (Tex. App.--El
Paso 1992, pet. ref'd). We do not resolve any conflict in fact, weigh any evidence or evaluate
the credibility of any witnesses, and thus, the fact-finding results of a criminal jury trial are
given great deference. Menchaca v. State, 901 S.W.2d 640, 650-52 (Tex. App.--El Paso
1995, pet. ref'd); Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); Matson
v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991); Leyva v. State, 840 S.W.2d 757, 759
(Tex. App.--El Paso 1992, pet. ref'd); Bennett v. State, 831 S.W.2d 20, 22 (Tex. App.--El
Paso 1992, no pet.). Instead, our only duty is to determine if both the explicit and implicit
findings of the trier of fact are rational by viewing all the evidence admitted at trial in the
light most favorable to the verdict. Adelman, 828 S.W.2d at 421-22. In so doing, we resolve
any inconsistencies in the evidence in favor of the verdict. Matson, 819 S.W.2d at 843,
(quoting Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)). The trier of fact,
not the appellate court, is free to accept or reject all or any portion of any witness's testimony. 
Belton v. State, 900 S.W.2d 886, 897 (Tex. App.--El Paso 1995, pet. ref'd).

 When conducting a review of the factual sufficiency of the evidence, we consider all
of the evidence, but we do not view it in the light most favorable to the verdict. Clewis v.
State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Levario, 964 S.W.2d. 290, 295 (Tex.
App.--El Paso 1997, no pet.). We review the evidence weighed by the jury that tends to
prove the existence of the elemental fact in dispute and compare it with the evidence that
tends to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Jones
v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct.
100, 139 L.Ed.2d 54 (1997). A defendant challenging the factual sufficiency of the evidence
may allege that the evidence is so weak as to be clearly wrong and manifestly unjust, or in
a case where the defendant has offered contrary evidence, she may argue that the finding of
guilt is against the great weight and preponderance of the evidence. See Johnson, 23 S.W.3d
at 11. Although we are authorized to set aside the fact finder's determination under either of
these two circumstances, our review must employ appropriate deference and should not
intrude upon the fact finder's role as the sole judge of the weight and credibility given to any
evidence presented at trial. See Johnson, 23 S.W.3d at 7. We are not free to reweigh the
evidence and set aside a verdict merely because we feel that a different result is more
reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Clewis, 922 S.W.2d
at 135. 

 The application paragraph in the court's charge to the jury provided:

Now if you find from the evidence beyond a reasonable doubt that on or
about the 15th day of November 1997 in El Paso County, Texas, the
Defendant, Norma Bustillos, did then and there with criminal negligence,
by omission, cause the death of JANE DOE, by failing to provide food,
shelter, medical care, or protection to JANE DOE, by failing to provide
food, shelter, medical care, under section 151.003 of the Texas Family
Code, and the Defendant was then and there the parent of JANE DOE, and
said JANE DOE was then and there a child younger than six years of age,
then you will find the defendant guilty of Criminal Negligent Homicide. 


 In accordance with the statutory definition, the trial court instructed the jury that
"criminal negligence" means:

A person acts with criminal negligence, or is criminally negligent, with
respect to circumstances surrounding her conduct or the result of her
conduct when she ought to be aware of a substantial and unjustifiable risk
that the circumstances exist or the result will occur. The risk must be of
such a nature and degree that the failure to perceive it constitutes a gross
deviation from the standard of care that an ordinary person would exercise
under all the circumstances as viewed from the actor's stand point. 


Tex. Pen. Code Ann. § 6.03 (d) (Vernon 1994). 


 The jury was also instructed that:


Section 151.003 of the Family Code provides, in part, that a parent of a
child has the following rights and duties:


The Duty to provide, care, protection, food, shelter, and medical care.


The duty of a parent to support his or her child exists while the child is an
unemancipated minor and continues as long as the child is fully enrolled in
an accredited secondary school in a program leading toward a high school
diploma until the end of the school year in which the child graduates. 


 In understanding what the State was required to prove in this case, a comparison of
"criminal negligence" with "recklessness" is useful. Criminal negligence is a lesser culpable
mental state than recklessness. Tex. Pen. Code Ann. § 6.03(c), (d) (Vernon 1994); see
Conroy v. State, 843 S.W.2d 67, 71 (Tex. App.--Houston [1st Dist.] 1992, no pet.). Criminal
negligence involves inattentive risk creation; the actor ought to be aware of the risk
surrounding her conduct or the results thereof. Lugo v. State, 667 S.W.2d 144, 147-48 (Tex.
Crim. App. 1984); Lewis v. State, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975); Todd v.
State, 911 S.W.2d 807, 814 (Tex. App.--El Paso 1995, no pet.). Reckless conduct involves
conscious risk creation; that is, the actor is aware of the risk surrounding her conduct or the
results thereof, but consciously disregards that risk. Todd, 911 S.W.2d at 814-15. At the
heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the
key to criminal negligence is found in the failure of the actor to perceive the risk. Id. at 815. 
Proof of a culpable mental state generally relies upon circumstantial evidence. Dillon v.
State, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978); Todd, 911 S.W.2d at 815. In most
instances, it must be inferred from the acts, words, and conduct of the accused and the
surrounding circumstances. Ledesma v. State, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984);
Todd, 911 S.W.2d at 815; Fuentes v. State, 880 S.W.2d 857, 860 (Tex. App.--Amarillo 1994,
pet. ref'd). The issue of whether criminal negligence is shown, that is, whether one should
be aware of a requisite risk, is a conclusion to be drawn through inference from all the
circumstances by the trier of fact. Dillon, 574 S.W.2d at 94; Todd, 911 S.W.2d at 815. 

 Initially, we note that at the charge conference, Appellant did not object to the
inclusion of the lessor-included offense of criminally negligent homicide in the charge to the
jury. (2) If a defendant requests or does not object to the submission of a lesser-included
offense and accepts the benefits of such a charge, she is estopped from challenging the legal
or factual sufficiency of the evidence. State v. Lee, 818 S.W.2d 778, 781 (Tex. Crim. App.
1991), overruled on other grounds by Moore v. State, 969 S.W.2d 4 (Tex. Crim. App. 1998);
Otting v. State, 8 S.W.3d 681, 687 (Tex. App.--Austin 1999, pet. ref'd, untimely filed). In
effect, an Appellant cannot induce the court to submit an instruction on a lesser included
offense or enjoy the benefits of such an instruction by failing to object to its submission and
then attack, as legally or factually insufficient, a subsequent finding of guilt. Otting, 8
S.W.3d at 686-87; Reaves v. State, 970 S.W.2d 111, 118 (Tex. App.--Dallas 1998, no pet.);
see Tamez. v. State, 865 S.W.2d 518, 519-20 (Tex. App.--Corpus Christi 1993, pet. ref'd). 
Therefore, we hold that Appellant, by not objecting to submission of the lesser charge to the
jury, waived her first issue challenging the legal and factual insufficiency of the evidence to
support her conviction for criminally negligent homicide. (3) Appellant's first issue is
overruled.

 In her second issue, Appellant maintains that Article 42.12(4) of the Code of Criminal
Procedure violates the equal protection clause of the United States Constitution. 


Tex. Pen. Code Ann. § 19.05(b) (Vernon 1994), provides that an offense under the
criminally negligent homicide statute is a state jail felony. Tex. Code Crim. Proc. art.
42.12, § 4(d)(2) (Vernon Supp. 2003) does not allow a jury to recommend that a person
found guilty of a state jail felony be placed on community supervision. However, the trial
court may, if it so desires, still place a state jail felon on community supervision. See Tex.
Code Crim. Proc. Ann. art. 42.12 § 15 (a) (Vernon Supp. 2003). Appellant maintains that
this sentencing scheme violated her right to equal protection as a jury may recommend
probation with regard to other non-state-jail offenses. Appellant asserts that there is no
rational basis for this distinction. 

 If a statutory classification does not interfere with a fundamental right or discriminate
against a suspect class, it need only be rationally related to a legitimate governmental purpose
to survive an equal protection challenge. Cannady v. State, 11 S.W.3d 205, 215 (Tex. Crim.
App.), cert. denied, 531 U.S. 850, 121 S.Ct. 125, 148 L.Ed.2d 80 (2000). Those attacking
the rationality of a legislative classification have the burden to negate every conceivable basis
that might support it. Anderer v. State, 47 S.W.3d 60, 66 (Tex. App.--Houston [14th Dist.]
2001, pet. ref'd). We apply a highly deferential standard of review to equal protection claims
of this nature. Id. This standard is extremely respectful of legislative determinations and
essentially means that a court will not invalidate a statute unless the statute draws distinctions
that simply make no sense. Id. The court in Anderer, (quoting Dandridge v. Williams, 397
U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)), stated: 

[A] State does not violate the Equal Protection Clause merely because the
classifications made by its laws are imperfect. If the classification has some
reasonable basis, it does not offend the Constitution simply because the
classification is not made with mathematical nicety or because in practice
it results in some inequality. The problems of government are practical
ones and may justify, if they do not require, rough
accommodations-illogical, it may be, and unscientific. A statutory
discrimination will not be set aside if any state of facts reasonably may be
conceived to justify it. 


Anderer, 47 S.W.3d at 66. 


 An equal protection assertion identical to the claim in this case was made in Anderer. 
The State maintained that state jail felonies are unique and there was a rational basis in the
Legislature's decision to limit the discretion solely to judges, who, unlike juries, are familiar
with the terms of community supervision, the availability of rehabilitative programs for state
jail inmates, as well as other aspects of the state jail felony system. Id. The court agreed and
held that the State had indicated a rational basis for the state jail sentencing scheme;
therefore, there was no equal protection violation. Id. at 67. 

 Appellant urges us to ignore the holding in Anderer because the stated rational makes
no sense in that judges will always be more familiar with the nuances of community
supervision with regard to any offense. Appellant also asserts that the sentencing options
available for such offenses as sexual abuse of a child and driving while intoxicated are much
more complicated than the sentencing options available for a state jail felony. 

 However, we find that we do not reach the merits of Appellant's contention. Appellant
must show that the statutory scheme is unconstitutional as to her, in her situation. County
Court of Ulster County, New York v. Allen, 442 U.S. 140, 154-55, 99 S.Ct. 2213, 2223-24, 60
L.Ed.2d 777 (1979); Parent v. State, 621 S.W.2d 796, 797 (Tex. Crim. App. 1981); McDonald
v. State, 863 S.W.2d 541, 546 (Tex. App.--Houston [14th Dist.] 1993, no pet.); Townsend v.
State, 725 S.W.2d 463 (Tex. App.--Houston [1st Dist.] 1987, pet. ref'd); Hypke v. State, 720
S.W.2d 158, 159-60 (Tex. App.--Houston [1st Dist.] 1986, pet. ref'd). In this case, the issue
of community supervision was fully considered by the court. As such, Appellant has not
demonstrated that the statute is unconstitutional as it was applied to her, and therefore she has
no standing to challenge its constitutionality. See Hypke, 720 S.W.2d at 159. Accordingly,
Appellant's second issue is overruled. 

 Having overruled each of Appellant's issues on review, we affirm the judgment of the
trial court.

March 20, 2003



 RICHARD BARAJAS, Chief Justice



Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.


(Do not publish)








C O N C U R R I N G O P I N I O N


 While I concur with the judgment in this cause, I write separately to express deep
reservations as to the procedural fairness of the sentencing scheme articulated in Article 42.12
with respect to the availability of community supervision for defendants convicted of state jail
felonies. On appeal Appellant raises a serious concern as to the fundamental fairness of
statutory provisions which permit a judge, but not a jury to recommend community provision
in state jail felony cases. For the following reasons, I find the state jail felony sentencing
scheme troubling. 

 Article 37.07 of the Texas Code of Criminal Procedure provides to every defendant a
statutory right to elect the judge or the jury to assess punishment. Tex. Code Crim. Proc.
Ann. art. 37.07 § 2(b) (Vernon 1981 & Supp. 2003). While the defendant's right is not a
constitutional right, her ability to exercise that right should nevertheless not be rendered
meaningless by subjecting her to arbitrary limitations once she has made a jury election. The
sentencing scheme for state jail felonies under Article 42.12 can produce in certain
circumstances, as here, an election between a jury or judge that more reflects trial strategy and
chance than the full exercise of a defendant's afforded rights. To this extent, the scheme
challenges notions of procedural due process and due course of law and unfortunately creates
unintended and perverse incentives within our criminal justice system.

 Procedures for state jail felony community supervision are governed by Article 42.12
§ 15, Texas Code of Criminal Procedure. Section 15(a) provides: 

 "[O]n conviction of a state jail felony punished under Section 12.35(a), Penal Code,
the judge may suspend the imposition of the sentence and place the defendant on
community supervision or may order the sentence to be executed. See Tex. Code
Crim. Proc. Ann. art. 42.12, § 15(a) (Vernon Supp. 2003).

In all felony cases except state jail felony cases, a jury assessing punishment may recommend
that its sentence be suspended and that the defendant be placed on community supervision. 
If the jury makes this recommendation in the verdict, the judge must suspend the sentence and
place the defendant on community supervision. See Tex. Code Crim. Proc. Ann. art. 42.12,
§§ 4(a), (d)(2), (e) (Vernon Supp. 2003). A defendant convicted of a state jail felony offense
may have the right to elect a jury to assess punishment, but knowing that the jury cannot
recommend probation for this type of felony, will most certainly elect the judge to assess
punishment because the judge may suspend the sentence and place her on community
supervision, thereby the defendant foregoes her right to a jury assessment. (4)

 In the present case, Appellant was indicted with capital murder, but the jury convicted
her of the lesser-included, state jail felony offense of criminally negligent homicide. Prior to
the punishment phase of her trial, Appellant filed a motion to change her jury election and
proceed to the court for punishment so that she would remain eligible for community
supervision. The court denied Appellant's motion and the jury sentenced Appellant to two
(2) years' imprisonment. Appellant filed a motion requesting suspension of her sentence. 
The court held it had authority to suspend the jury's sentence in a state jail felony and after
a hearing on community supervision, the court denied Appellant's motion. Though Appellant
had a right to have the jury assess punishment under Article 37.07, Section 2(b), Appellant
apparently attempted to forgo that right because Article 42.12, Section 15(a) alters the jury's
ability to recommend probation for state jail felonies, while retaining the jury's ability to make
such a recommendation for other felonies of greater severity. (5) I have yet to be persuaded that
there exists a rational justification for such a distinction in state jail felony sentencing. 
Although this Court has disposed of Appellant's second issue on standing grounds,
Appellant's challenge clearly calls into question whether the statute as enacted falls within the
bounds of due process and due course of law in Texas.

March 20, 2003


 

 
DAVID WELLINGTON CHEW, Justice















1. There was testimony at trial that the heater in the house trailer was not working on the night of the birth
and the temperature inside was very cold. 
2. Specifically, Appellant objected to the submission of the capital murder charges because the State failed
to prove that Appellant intentionally or knowingly caused the death of the infant. However, Appellant did not object
to the submission of the criminally negligent homicide charge. 
3. Moreover, even if Appellant's failure to object to the lesser charge did not bar her from challenging the
sufficiency of the evidence to support her conviction, Appellant's first issue is without merit. We have closely
examined the facts presented to the jury. Applying to those facts the aforementioned legal and factual sufficiency
standards, we find the evidence contained in the record legally and factually sufficient to support Appellant's
conviction for criminally negligent homicide. The evidence demonstrated that Appellant ought to have been aware
that the exposure of a newborn infant to freezing temperatures would cause its death, which in and of itself is a
substantial and unjustifiable risk, and that her failure to perceive the risk was a gross deviation from the standard of
care that an ordinary person would exercise under all the circumstances viewed from her standpoint. 
4. Section 15(a) does not expressly state whether the judge has authority to suspend jury-imposed as well as
judge-imposed sentences, however, the plain reading of this statute suggests that the judge's authority to suspend
applies in both circumstances. See e.g., Rhodes v. State, 997 S.W.2d 692, 695 (Tex. App.--Texarkana 1999, pet.
ref'd) (applying Article 42.12, Section 15(a) in a state jail felony case in which the jury had assessed punishment). 
5. The Anderer court noted this dilemma when it remarked that "an effect of this statutory scheme is that a
state jail felon who may be entitled to probation from a judge, is absolutely prohibited from seeking probation from a
jury. The end result, [Appellant] states that a defendant who wishes to elect the jury in punishment in a state jail
felony where the use of a deadly weapon is alleged, is put in the position of arguing in the guilt/innocence phase that
he is not guilty of a state jail felony, but, at the same time, arguing that if the jury does find him guilty, to find him
guilty of using a deadly weapon as well so that he may be eligible for probation in punishment." Anderer v. State, 47
S.W.3d 60, 65 (Tex. App.--Houston [14th Dist.] 2001, pet. ref'd).