Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



SAMUEL FERTIC,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-04-00168-CR

Appeal from the

41st District Court

of El Paso County, Texas

(TC# 20020D00048)




O P I N I O N

           This is an appeal from a jury conviction for the offense of aggravated assault with a
deadly weapon. The jury assessed punishment at ten years’ imprisonment and a fine of
$10,000. We affirm the judgment of the trial court.
I. SUMMARY OF THE EVIDENCE
           Appellant was indicted for the offense of murder. The jury returned a verdict of guilty
to the lesser-included offense of aggravated assault. The jury answered affirmatively to the
special issue submitted inquiring whether or not Appellant used a deadly weapon during the
commission of the offense.
 

           At trial, the evidence revealed that on September 1, 2001, personnel from the El Paso
County Medical Examiner’s Office, emergency medical personnel, and police officers were
dispatched to the apartment of Lisa Fertic and her ex-husband, the Appellant. Upon arrival,
the medical technicians found Lisa Fertic, the victim, lying on her bedroom floor, which was
covered in clothes. It was apparent that she had been without oxygen for some time and was
dead.
           El Paso Police Officer Orlando Hernandez was the first officer dispatched to the
victim’s apartment. Upon arrival, the officer requested assistance, and Officer Juan Ferrel
arrived later. Officer Hernandez noted that the apartment was very messy and unkept. 
Specifically, he observed several beer cans scattered throughout the apartment. Similarly,
Officer Ferrel testified that the apartment was dirty, unkept, and contained “a lot of beer
cans.” However, Officer Ferrel did not observe any signs of a struggle. As the paramedics
attended to both the victim and the Appellant, Officer Hernandez learned that she had been
taking medication for depression. Officer Ferrel noted that the victim’s face was pale and
that a white, watery substance was on her lips.
           Officer Hernandez then gathered some information from the Appellant and made a
report. At that time, the officer was labeling the event as an unattended death. During his
conversation with the Appellant, Officer Hernandez learned that the Appellant last saw the
victim at 2:30 a.m. The Appellant then divulged that he had slept on the living room couch
that night and when he woke up later that morning, he knocked on the bedroom door, which
was shut. When she did not answer, he entered the room, and found her lying on the floor. 
Officer Hernandez testified that the Appellant appeared very distraught and troubled
throughout the conversation, and he contacted a chaplain to comfort him. After speaking
with the Appellant, Officer Hernandez instructed him to go upstairs with his neighbor, who
was standing beside him.
           Officer Hernandez then contacted his supervisor and told him that something was
suspicious about the deceased’s demise. Upon conclusion of that conversation, Officer
Hernandez went to speak with the Appellant again. During this discussion, the officer
learned that the victim and Appellant had slept in different rooms because, according to the
Appellant, she had a habit of waking up several times throughout the night to peek out the
living room blinds. But the Appellant told the officer that she had not engaged in such
behavior on the night of her death.
           Officer Ferrel also spoke with the Appellant. After asking for his side of the story,
Appellant explained that he had a verbal argument with the victim earlier that night, and that
the victim slept in the bedroom while he slept on the sofa. The Appellant then stated that the
victim kept getting up throughout the night to look out the window, and that he last saw her
around 2:30 a.m. The Appellant did not tell the officer whether the victim had been using
either prescription or illegal drugs.
           Robin Kasson, a medical examiner investigator, also responded to the scene. Afer
gathering basic information from Officer Hernandez, Kasson examined the body. According
to Kasson, the body was cold to the touch, her color was dark and reddish, and she was stiff. 
Based on these observations, Kasson concluded that the victim had been dead for quite some
time. Kasson then noticed a froth around the victim’s nostrils and mouth, a stiff jaw, and a
laceration above her eyebrow. Kasson observed some bruising around the victim’s knees,
a bruise on her upper leg, and some red marks on her right inner thigh.
           Kasson then noticed that the bedroom was disorganized and that several piles of
clothes were strewn around, but she also found no signs of a struggle. Kasson also learned
that some prescription drugs were lying atop the dresser--a bottle of Wellbutrin and some
blister packets containing ferrous sulfate (an iron supplement) and Lamictal. Kasson then
spoke to the Appellant. She explained that the purpose of the discussion was two-fold: (1)
to obtain medical information; and (2) to find out what happened leading up to the death. It
was brought to Kasson’s attention that the victim was on medication. Appellant then
divulged that the victim was a smoker, drinker, and had used illegal drugs in the past. The
Appellant also told Kasson that he suspected that the victim may have started using illegal
drugs again and elaborated that he saw a baggie in her cheek, that the phone number written
on her hand was probably a drug contact, and that she had been acting strange for the past
two weeks.
           Kasson next asked the Appellant to explain what happened, and he elucidated that
they had consumed beer and watched television. The Appellant told Kasson that the victim
went into the bedroom around 2:30 a.m., and that he fell asleep on the couch. He stated to 
Kasson that he went to check on the victim around noon on the following morning, and
found her unresponsive.
           Michael Velez, a crime scene technician, was also dispatched to the victim’s
apartment concerning an unknown cause of death. Upon arrival, Velez noted that the
apartment was unkept, dirty, and in disarray. Several beer cans were visible throughout the
living room and kitchen. No ice pack was found near the bed or next to the victim. Upon
meeting the Appellant, Velez noted that he was bothered and perturbed, but he did not appear
to be grieving.
           Subsequently, an autopsy was conducted on the victim’s body by Dr. Corinne Stern. 
While performing the autopsy, Dr. Stern suspected that the death was a possible homicide. 
Consequently, she contacted Detective Armando Fonseca and requested his presence at her
office. Initially, Dr. Stern noted that the victim was well-nourished and appeared to be well-developed. But Dr. Stern did notice the victim had two abrasions on her face and a black
eye. Internally, the doctor discovered that she had several contusions in the front most
portion of the scalp area. Also, Dr. Stern found several bruises on the top and back of the
scalp, each of which was labeled as a separate impact site. Dr. Stern discovered significant
bleeding inside the cranium--at least sixty milliliters of blood. In her opinion, such bleeding
alone was sufficient to be fatal. Dr. Stern characterized the injuries to the head as blunt force
injuries. In other words, she believed the victim was struck in the head with a hard object
or her head was struck against something hard. She further opined that the injuries were not
self-inflicted because there were no injuries to the neck area. The doctor also noted that her
brain was starting to swell, which was a reaction to the bleeding. Specifically, the brain was
pushing into the foramen magnum creating notches in the cerebellum and causing the brain
to herniate.
           Dr. Stern found several contusions on the thorax, both externally and internally. 
Specifically, she found bruises along with a fractured rib and bleeding from the rib cage. She
testified the bruises were consistent with marks left by the knuckles of a fist. Dr. Stern also
discovered several contusions on the victim’s arms and legs. In her opinion, none of the
victim’s injuries including those to the head, appeared to be self-inflicted. Further, there
were no signs that CPR had been administered to the victim. However, a large amount of
cocaine toxicity was found in her bloodstream. Dr. Stern arrived at the opinion that the
victim’s death was a homicide, and was the result of concurrent causes: cocaine intoxication
and blunt force trauma to the head.
           Based on Dr. Stern’s conclusions, Detective Fonseca gathered a group of detectives
to conduct a follow-up investigation. Fonseca, along with Detectives Martinez, Pantoja,
Ruiz, and Baca and Sergeant Hinojosa, then went back to the apartment to speak with the
Appellant. After showing their credentials and explaining what they were investigating, the
Appellant allowed them to enter the apartment. Specifically, the detectives asked whether
he would consent to a search of the apartment and whether he would willingly go to the
police headquarters to give a statement regarding the death. Appellant agreed to both.
           Appellant was then transported without handcuffs, and in an unmarked car to the
Crimes Against Persons police station with Detectives Fonseca and Martinez. Once there,
the Appellant was Mirandized and after agreeing to be interviewed by Detective Fonseca,
gave a statement. That statement sets out that the victim and the Appellant had bought and
drank beer together on the evening of August 31, 2001, and that the victim had purchased
cocaine from a drug dealer known to the Appellant only as Freak. The statement further sets
out that the victim’s behavior became paranoid and irrational after she consumed the cocaine. 
According to the Appellant, the victim went into her bedroom alone, and he heard noises
coming from the room that sounded like banging on the walls. He characterized the banging
as sounding as if she was looking for something in the bedroom; this lasted thirty minutes. 
He states that he subsequently entered the room and found the deceased lying on the floor
face up with her head up against the wall. He noticed a piece of a barrette which had been
in the deceased hair on the floor so he checked her head for injuries and did not find any. He
then checked to see if she breathing, and found that she was breathing. The Appellant stated
in his statement that he thought she was passed out drunk and he put her in bed and placed
an ice pack next to her. He then went to sleep on the living room couch and when he looked
in on her the following day, she was dead. In his statement, the Appellant avers that he had
struck his wife in the past, but he denies ever hitting her while he had been in El Paso. He
states he does not know what happened to his wife, the victim, but he suspects that she died
of the medication, beer, and cocaine.
           At trial, there was testimony from the witness, Jonathan Hardy, a friend of the victim’s
family. He was working as a cashier at the Albertsons grocery store, and on August 31,
2001, at approximately 6:30 or 7 p.m., he observed her and the Appellant purchasing a thirty-pack of beer. Hardy testified that in the past he had observed individuals under the influence
of cocaine and based on his experience he did not believe that the victim was intoxicated by
cocaine or alcohol. He testified further that she was wearing a short-sleeved shirt and he got
a good look at her face and arms, but did not observe any injuries or bruises. In addition,
there was testimony from Linda King, the victim’s mother, indicating that she had spoken
with her on the telephone sometime between 8 and 9 p.m. on the evening before her death. 
During that conversation, her daughter behaved normally and did not seem to be high or
intoxicated in any fashion. So, King was shocked when she learned of her death the
following day.
           Dr. Ronald Charles Backer, a board certified forensic toxicologist, reviewed the
autopsy and toxicologist reports performed on the victim. According to his testimony, there
were no traces of Wellbutrin, ferrous sulfate, or alcohol in the victim’s body. In fact, the
only two substances found in the victim’s body were cocaine and the major metabolite of
cocaine. Based on Dr. Backer’s conclusions, she ingested between 1.2 to 2.2 grams of pure
cocaine. Based on the amount of cocaine consumed by the victim, Dr. Backer estimated that
she would have died within an hour from the moment she ingested it.
           The defense expert, Dr. Cyril Wecht, a specialist in forensic pathology, also reviewed
the autopsy report and toxicology record, among other items. But Dr. Wecht did not agree
with Dr. Stern’s conclusion that the victim died from blunt force injuries to the head in
combination with acute cocaine intoxication. Specifically, Dr. Wecht opined that the level
of cocaine intoxication and not the head injuries caused the victim’s death. According to
him, the head injuries would be a “one” at best on a scale of one to ten. He testified that the
victim would have had only a bad headache for a couple of days which would have required
only aspirin or ibuprofen. In Dr. Wecht’s opinion, her death was solely drug-related. His
findings suggest that the lungs were filled with fluid, which was caused by the ingestion of
cocaine and the amount of cocaine found in the blood alone was enough to cause her death. 
Consequently, Dr. Wecht opined that the victim died from acute cocaine toxicity. Further,
the doctor stated that any of the injuries found on her body, including the fractured rib, could
have been caused by simply brushing up against or falling on top of items found in her
bedroom while under the effects of cocaine.
           In contrast to Dr. Wecht, Dr. Juan Contin, deputy medical examiner, agreed with Dr.
Stern that the victim’s death was a homicide. According to Dr. Contin, although the sixty
milliliters of blood collected in the brain from the head injuries was not a large amount, the
combination of the amount of blood, the swelling of the brain, and the head injuries were
sufficient to cause her death. Specifically, the brain had swelled and pushed itself into the
foramen magnum, impairing the cerebellum--the portion of the brain that controls body
functions such as heartbeat and breathing. Dr. Contin further testified that an aspirin, as Dr.
Wecht had suggested, would actually be the worst thing to give somebody with a bleeding
head injury because it would have enhanced the bleeding tendency.
           Dr. Contin elaborated that the bruises to the victim’s arms and legs, as well as the
injuries to her head, were nonprotuberant. In other words, because the bruises were located
in areas where a person could not receive a bruise by falling down, the bruises appeared to
have been inflicted by someone else. Nor would the victim, according to the doctor, be able
to inflict such bruises upon herself while flailing about in an excited state caused by cocaine
usage.
           Linda King, the victim’s mother, testified that she was her best friend. Linda would
go to her daughter’s house everyday, and they would talk. She explained that her daughter
and the Appellant met in Florida in 1993 and married in 1996. But the marriage only lasted
six months, and they later divorced.
           In 1998, the Kings, along with the victim, relocated from Florida to El Paso. There
the victim moved into the apartment where she lived until her death. She remained in contact
with the Appellant, and in July of 2001, he moved to El Paso. Linda testified that her
daughter was treated for cocaine addiction in Florida and El Paso. She believed that her
daughter had not used cocaine during the four months preceding her death. Further, she 
revealed that the victim had emotional problems when she was young. Specifically, she
attempted to commit suicide at ages fifteen and eighteen, and she was subsequently
diagnosed as depressed. According to the victim’s treating physician, her prior suicide
attempts were not serious efforts but simply attention-grabbing gestures.
           Jennifer Roberts, who had known the victim since the seventh grade, elaborated on
her character and her relationship with the Appellant. Roberts met the Appellant through a
friend, who is now her husband. Although the victim and Roberts drifted apart in 1989 or
1990, the Appellant remained a part of her life since he was best friends with her husband. 
           In 1994, the Appellant and the victim began dating, and consequently, she and Roberts
began their friendship anew. At that time, Roberts also learned that both the victim and the
Appellant were using cocaine. Between 1996 and 1997, Roberts, along with the victim and
the Appellant, would ingest cocaine, crack, and marijuana approximately three to five times
each week. According to Roberts, the Appellant was always in charge of the drugs.
           Although she believed that the Appellant cared for the victim, Roberts testified that
he was very controlling. Specifically, the Appellant wanted her to stay at home and keep to
herself. The Appellant did not want her using the phone, and she could not leave the house
unless he was with her. In addition, the Appellant would not allow the victim to get the mail,
and she could not read it until the Appellant had finished with it.
           Roberts recalled one incident where the Appellant physically abused the victim. She
and the Appellant were staying at Roberts’s house in November 1997. She testified that
before she went to bed, everything was fine--“everybody was laughing, [and] joking.” The
room that Appellant and the victim were sleeping in was immaculately clean. The following
morning, when Roberts went into that room, it looked “like a tornado went through it.” 
Specifically, a shelf was hanging off the wall, there was blood on the walls, the curtains were
ripped from the walls, and the sheets were off the bed. Roberts saw the victim crumpled
naked on the floor at the end of the bed with a comforter around her. The Appellant was
asleep on the living room sofa. The victim had a black eye, blood matted into her hair, and
blood and bruises all over her arms. Roberts testified that she was upset, hurt, scared, and
traumatized. When Roberts woke her, she started crying. After talking to the victim for ten
minutes, Roberts learned that the Appellant had physically abused her. Roberts then tried to
push her out the window to get her away from the Appellant, but the victim did not want to
leave--she relayed that she was scared to leave him. The next day, Roberts asked the
Appellant what happened to the items in the bedroom, and without saying more, he simply
responded that he would pay for it.
           Roberts then testified to another incident that occurred in late 1996. During that time,
the Appellant and the victim were staying at Henry Krause’s house. Roberts arrived at his
house one day to take the Appellant and the victim shopping. Outside, Roberts heard the
Appellant and the victim arguing inside the residence. Roberts walked inside and heard the
Appellant yelling at the victim, and her screaming “stop.” She next saw the Appellant strike
her in the face and then pick her up and throw her onto the floor. The Appellant sat on the
victim, and she told the Appellant to get up because she could not breathe. After a couple
of seconds, the Appellant acquiesced, and the victim turned to walk away, but the Appellant
struck again by pushing her. The fight soon ended, and the victim and the Appellant left with
Roberts to go shopping. On another occasion, Roberts relayed that the Appellant pushed the
victim out of their apartment and locked the door. The victim was erratic, stunned, and
upset.
           Henry Krause also testified at trial. He first met the Appellant in 1991 and the victim
several years thereafter. Between 1995 and 1997, the Appellant and the victim stayed at
Krause’s house. While there, Krause and the couple regularly ingested crack cocaine. 
Krause testified that the Appellant became paranoid when he ingested drugs. Specifically,
the Appellant would look out windows and doors, thinking someone was there. Krause also
testified that the victim would also get paranoid and scared, but he never observed her
running around or throwing herself into things.
           According to Krause, the Appellant mentally abused the victim, and on one occasion,
physically abused her. The physical altercation occurred sometime between 1996 and 1997. 
The Appellant had called his family to come and get him, and he wanted the victim gone
before they arrived. At that point, the Appellant’s demeanor was calm. But when his parents
arrived, she had not left, and according to Krause, the Appellant began cursing and
screaming at the victim. Not only did he throw things, but the Appellant also pushed the
victim to the floor and kicked her on the side. The Appellant then grabbed a Bible and ran
out the back door.
           Krause also testified to another occasion when the Appellant refused to let the victim
go to work. The Appellant and the victim were arguing over the use of the car, and when she
drove off in the car, the Appellant ran her down and stopped her.
           Dr. Bernardo Aleksander was the victim’s psychiatrist. After a comprehensive
psychiatric evaluation in June of 1999, he diagnosed her as suffering from major depressive
disorder. Later, her diagnosis was changed to bipolar disorder. According to the doctor, the
victim was well-connected with reality and a normal, functioning adult. Throughout the
entire time that Dr. Aleksander treated the victim, she exhibited no signs of paranoia. Dr.
Aleksander further testified that the victim never exhibited any signs of suicide during her
treatment with him.
           The defense presented several witnesses who testified to he victim’s unstable
behavior. According to the testimony of Miguel Reyes, who lived in the same apartment
complex as the victim and the Appellant, although the victim appeared to be normal, she
would quite often “flip out” and start acting weird. Specifically, Reyes testified to one
occasion where she entered the living room of her apartment with a knife and accused him
and the Appellant, who were watching television at the time, of calling the police. Reyes
testified that on another occasion, the victim started cursing and yelling at him when he
merely said “hi” as she arrived at her apartment.
           Christopher Giles also testified that while working in his capacity as the manager at
Wal-Mart, he witnessed some strange behavior. Specifically, he witnessed the victim waving
a sheet of paper, walking back and forth from the front door to the registers, and vocalizing
“I can’t find this” and “where is this?” Giles attempted to help her, but the victim, according
to him, refused any assistance. Consequently, Giles motioned for the security guard to watch
her. Later, the Appellant, who was with the victim at the time, apologized to Giles for the
victim’s behavior.
           Further, Denise Sanford, who worked at a chiropractic clinic, testified to another
occasion that occurred in 2001. According to her testimony, the victim frantically entered
the office looking for the Appellant, who was receiving treatment there. She appeared to be
hysterical and was screaming and yelling because her car had been stolen.


 Denise did not
witness any interaction between the victim and the Appellant other than talking. However,
she testified that during prior sessions, she was concerned with the number of bruises she
observed on the victim’s legs.
           Thomas Fertic, the Appellant’s father, also attested to the relationship between the
victim and the Appellant. He testified he observed their relationship for several years before
the two were married, during their marriage, as well as after their divorce. Thomas never
witnessed any abusive behavior by the Appellant or the victim. Nor did he observe any
controlling or domineering behavior between the two. He also testified that during the time
that the victim had moved to El Paso and the Appellant was still in Florida, they had contact
by phone several times a day and by mail once per day.
 

II. DISCUSSION
           In Issue Nos. One and Two, Appellant challenges the factual sufficiency of the
evidence to support a conviction for the lesser-included offense of aggravated assault and the
affirmative finding of the use of a deadly weapon in the commission of the offense. Initially,
we note that at the charge conference, Appellant did not object to the inclusion of the
lesser-included offense of criminally negligent homicide in the charge to the jury. If a
defendant requests or does not object to the submission of a lesser-included offense and
accepts the benefits of such a charge, he is estopped from challenging the legal or factual
sufficiency of the evidence. State v. Lee, 818 S.W.2d 778, 781 (Tex. Crim. App. 1991),
overruled on other grounds by Moore v. State, 969 S.W.2d 4 (Tex. Crim. App. 1998); State
v. Yount, 853 S.W.2d 6, 9 (Tex. Crim. App. 1993); Otting v. State, 8 S.W.3d 681, 686-87
(Tex. App.--Austin 1999, pet. ref’d, untimely filed). In effect, an Appellant cannot induce
the court to submit an instruction on a lesser-included offense or enjoy the benefits of such
an instruction by failing to object to its submission and then attack, as legally or factually
insufficient, a subsequent finding of guilt. Otting, 8 S.W.3d at 686-87; Reaves v. State, 970
S.W.2d 111, 118 (Tex. App.--Dallas 1998, no pet.); see Tamez. v. State, 865 S.W.2d 518,
519-20 (Tex. App.--Corpus Christi 1993, pet. ref’d). Therefore, we hold that Appellant, by
not objecting to submission of the lesser charge to the jury, waived his first issue challenging
the factual insufficiency of the evidence to support his conviction for aggravated assault.
           However, notwithstanding this rule of estoppel, we have applied the factual
sufficiency standard of review to the instant case and we find that the evidence is factually
sufficient to support the conviction and the finding of use of a deadly weapon. In conducting
a factual sufficiency review, we view the evidence in a neutral light to determine whether a
jury was rationally justified in finding guilt beyond a reasonable doubt. We set aside the fact
finder’s verdict only if (1) the evidence supporting the verdict, when considered by itself, is
too weak to support the finding of guilt beyond a reasonable doubt; or (2) evidence contrary
to the verdict is strong enough that the beyond-a-reasonable-doubt standard could not have
been met. Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004). However, our
factual sufficiency review must be appropriately deferential so as to avoid substituting our
judgment for that of the fact finder. Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App.
1996). Accordingly, we are authorized to set aside the jury’s finding of fact only in instances
where it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. Id. at 135. 
If the evidence is factually insufficient, we remand to the trial court for a new trial. Id. at
133-35.
           One commits the offense of assault by intentionally, knowingly, or recklessly causing
bodily injury to another, including the person’s spouse. Tex. Penal Code Ann. §
22.01(a)(1) (Vernon Supp. 2005). An assault becomes an aggravated assault when a person
uses or exhibits a deadly weapon during its commission. Tex. Penal Code Ann. §
22.02(a)(2) (Vernon Supp. 2005). A deadly weapon is “anything that in the manner of its use
or intended use is capable of causing death or serious bodily injury.” Tex. Penal Code
Ann. § 1.07(a)(17)(B) (Vernon Supp. 2005). Serious bodily injury is defined as “bodily
injury that creates a substantial risk of death or that causes death, serious permanent
disfigurement, or protracted loss or impairment of the function of any bodily member or
organ.” Tex. Penal Code Ann. § 1.07(a)(46) (Vernon Supp. 2005).
           In the instant case, a significant amount of circumstantial evidence was presented to
establish the Appellant’s guilt. The record shows that the Appellant was living with the
victim at the time of her death. According to all medical personnel and officers dispatched
to the scene, the Appellant was the only person at the apartment when they arrived. Although
the Albertsons cashier, as well as Miguel Reyes, did not see any bruises on the victim’s arms
or face on the day preceding her death, the medical examiner found several bruises on her
body that the medical examiner characterized as not having been self-inflicted. 
Consequently, a reasonable trier of fact could have inferred that the Appellant, who was
alone with the victim in the apartment in the hours preceding her death, was the source of her
injuries. See Elledge v. State, 890 S.W.2d 843, 847 (Tex. App.--Austin 1994, pet. ref’d) (jury
could have reasonably inferred that Appellant committed the offense based on the fact that
Appellant was alone with the deceased when the injuries occurred).
           The Appellant alleges that the victim could have received her injuries from either her
drug dealer, whom he alleges she visited with on the evening before her death, or from
stumbling and falling about the apartment while in an excited state caused by the ingestion
of cocaine. It would be reasonable for the jury to disregard Appellant’s claim that Freak, the
drug dealer, inflicted her injuries. Appellant mentions her purchasing cocaine from Freak,
but he did not at any time state that she was injured or bruised upon returning from her
meeting with him. Further, Appellant never divulged the allegations that Freak had injured
the victim to either the responding medical examiners or the police. Accordingly, the jury,
as the sole judge of the weight and credibility to be given the testimonies and evidence
presented at trial, was free to reject the Appellant’s allegations. See Goodman v. State, 66
S.W.3d 283, 287 (Tex. Crim. App. 2001) (jury free to reject Appellant’s alternative,
inconsistent explanations concerning who inflicted the injuries on the victim).
           Furthermore, as evidence that the victim’s injuries were not self-inflicted, both Dr.
Stern and Dr. Contin determined that the bruises on her head and body were located in areas
where a person could not receive such contusions by simply stumbling around or falling
down. Concerning the injuries to her head, Dr. Stern specifically testified that since the
victim had no neck injuries, her head injuries could not have been caused by falling to the
floor or on top of objects found in the apartment and were therefore, not self-inflicted. 
Further, she stated that the exterior bruises found near her rib cage were consistent with
marks left by the knuckles of a fist. The defense disagreed and offered the opinion of Dr.
Wecht, which supported the Appellant’s allegation that she self-inflicted her injuries by
banging her head in the bedroom. Dr. Wecht not only testified that the victim’s head injuries
were insufficient to cause death, but he also testified that such injuries could have been
caused while the victim was high on cocaine by simply falling down on the ground or on top
of objects located in the bedroom.
           The credibility of the experts was an issue for the jury as the sole judge of the weight
and credibility to attach to each witness. The trier of fact, not the appellate court, is free to
accept or reject all or any portion of any witness’s testimony. After a neutral review, we
must conclude that the proof of guilt is not so obviously weak as to undermine confidence
in the fact finder’s determination of the proof of guilt. Consequently, the evidence is
sufficient to support Appellant’s conviction for the offense of aggravated assault.
           Further, ample evidence was presented that the Appellant used or exhibited a deadly
weapon. Specifically, Dr. Stern testified that the victim received blunt force trauma to her
head. To sustain such injuries, someone would have had to strike her head with a hard object
or strike her head against a hard object. According to Dr. Stern and Dr. Contin, the head
injuries caused the brain to swell to an extent sufficient to cause the victim’s death. 
Moreover, Dr. Stern testified that the victim had a fractured rib cage and that the external
bruises covering the rib cage were consistent with marks left by the knuckles of a fist. In
determining whether a deadly weapon was used, the jury may consider all the facts of the
case. Bethel v. State, 842 S.W.2d 804, 807 (Tex. App.--Houston [1st Dist.] 1992, no pet.). 
Additionally, the jury may affirmatively find that a deadly weapon was used even if the
object was not identified. Gordon v. State, 173 S.W.3d 870, 873 (Tex. App.--Fort Worth
2005, no pet.) (citing Regan v. State, 7 S.W.3d 813, 819-20 (Tex. App.-- Houston [14th
Dist.] 1999, pet. ref’d); Mixon v. State, 781 S.W.2d 345, 346-47 (Tex. App.--Houston [14th
Dist.] 1989), aff’d, 804 S.W.2d 107,108 (Tex. Crim. App. 1991) (adopting as its own, part
of court of appeals’ opinion holding that deadly weapon finding may be made even if object
not identified). Further, the presence and severity of wounds on the injured party are factors
to be considered in determining whether an object was used as a deadly weapon. Bethel, 842
S.W.2d at 807; Mixon, 781 S.W.2d at 347. A reasonable juror could have found by the
presence and severity of the victim’s injuries, that Appellant did in fact use a deadly weapon,
although such weapon was never discovered. Consequently, the evidence was factually
sufficient to show that the Appellant used a deadly weapon in committing the aggravated
assault. We have examined all of the evidence impartially, and giving due deference to the
jury’s verdict, we conclude that the evidence contrary to the verdict is not strong enough that
the beyond-a-reasonable-doubt standard was not met and the evidence was not such that it
is manifestly unjust, shocks the conscience, or clearly demonstrates bias. Issue Nos. One and
Two are overruled.
           Appellant contends in Issue No. Three, that the trial court erred in allowing the
testimony of Jennifer Roberts, to the effect that she had witnessed the Appellant previously
assault the deceased on two separate occasions. Similarly, in Issue No. Four, Appellant
complains that the trial court erred in allowing the testimony of Henry Krause, also to the
effect that the Appellant had previously assaulted the deceased. Specifically, the Appellant
asserts that the evidence of extraneous offenses does not have relevancy beyond character
conformity. Further, Appellant contends that the evidence was more prejudicial than
probative.
           A trial court’s ruling concerning the admissibility of evidence of other crimes, wrongs,
or acts is reviewed under an abuse of discretion standard. Montgomery v. State, 810 S.W.2d
372, 391 (Tex. Crim. App. 1990); Williams v. State, 927 S.W.2d 752,758 (Tex. App.--El
Paso 1996, pet. ref’d). As long as the trial court’s ruling is within the zone of reasonable
disagreement, its decision should not be disturbed. Montgomery, 810 S.W.2d at 387, 391;
Williams, 927 S.W.2d at 758. The test for abuse of discretion is not whether, in the opinion
of the reviewing court, the facts present an appropriate case for the trial court’s action.
Rather, it is a question of whether the court acted without reference to any guiding rules and
principles. Another way of stating the test is whether the act was arbitrary or unreasonable.
The mere fact that a trial judge may decide a matter within his discretionary authority in a
different manner than an appellate judge in a similar circumstance does not demonstrate that
an abuse of discretion has occurred. Montgomery, 810 S.W.2d at 380. In the instant case,
the Appellant maintains that when asked to articulate the relevancy of the extraneous offense
to a particular material fact of the case, the trial court refused to do so. However, while the
trial court is required to perform the Rule 403 balancing test, it need not enter its thought
processes on the record. See Rojas v. State, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998). 
If the record is silent, we will presume that the trial court properly conducted the test prior
to ruling on the objection. See id.
           Tex. R. Evid. 404(b) provides that evidence of other crimes, wrongs, or acts is not
admissible to prove the character of a person in order to show action in conformity therewith. 
It may, however, be admissible for other purposes, such as proof of motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided
upon timely request by the accused, reasonable notice is given in advance of trial of intent
to introduce in the State’s case-in-chief such evidence other than that arising in the same
transaction. Tex. R. Evid. 404(b). Further, in a murder prosecution, the state or the
defendant shall be permitted to offer testimony as to all relevant facts and circumstances
surrounding the killing and the previous relationship existing between the accused and the
deceased, together with all relevant facts and circumstances going to show the condition of
the mind of the accused at the time of the offense. Tex. Code Crim. Proc. Ann. art.
38.36(a) (Vernon 2005).
           Under Tex. R. Evid. 401, evidence is relevant if it has any tendency to make the
existence of a fact of consequence more or less probable. Montgomery, 810 S.W.2d at 387. 
The State argues that the evidence was relevant under Article 38.36(a) of the Code of
Criminal Procedure to show intent and to rebut defensive theories, as well as to depict the
nature of the relationship between the victim and the Appellant. See Tex. Code Crim. Proc.
Ann. art. 38.36(a) (Vernon 2005). Throughout the trial, the Appellant denied ever striking
the victim on the night of her death and urged, as defensive theories, that the victim caused
her own injuries and death by alleging alternative scenarios: (1) that, based on her past, she
killed herself by “banging” her head against the walls in the bedroom while high on cocaine;
(2) that Freak, the drug dealer, assaulted her, as alleged in Appellant’s statement; or (3) that
the victim simply received her injuries, as testified to by Dr. Wecht, by injuring herself by
falling about the bedroom while high on cocaine. The evidence of the extraneous offenses
was relevant and necessary to the prosecution in order to rebut these defensive tactics.
           In addition, the evidence showing the previous relationship between the Appellant and
the victim became relevant to show an ongoing course of violence, and also to prove that it
was his conscious objective to commit aggravated assault and thereby an act clearly
dangerous to human life. Further, it provided some insight into the condition of the mind of
the accused at the time of the offense. Thus the extraneous offenses were relevant to an issue
of consequence other than the Appellant’s character. See Robbins v. State, 88 S.W.3d 256,
261-62 (Tex. Crim. App. 2002).
           It is clear to us that the complained-of testimony, when considered in the context of
the other evidence at trial is relevant; it provides the “small nudge” toward proving
Appellant’s motive if he assaulted the deceased. Having found the evidence to be relevant,
we must determine if the record reveals that the trial court abused its discretion in choosing
to admit the evidence. See Montgomery, 810 S.W.2d at 381.
           The Appellant contends that the evidence, if relevant, was more prejudicial than
probative. Although relevant, evidence may nonetheless be excluded if its probative value
is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. The Court
of Criminal Appeals has held that where relevant criteria, viewed as objectively as possible,
leads to the conclusion that the danger of unfair prejudice substantially outweighed the
probative value of the proffered evidence, the appellate court should declare that the trial
court erred in failing to exclude it. Montgomery, 810 S.W.2d at 392. However, an appellate
court should not make a de novo review of the record with a view of making a wholly
independent judgment whether the probative value of the extraneous act is substantially
outweighed by the danger of unfair prejudice. Id. In conducting our review, we must
measure the trial court’s ruling against the relevant criteria by which a Rule 403 decision is
to be made. Id. The trial court has no “right” to be “wrong” if that means to admit evidence
which appears to the appellate court, affording all due deference to the trial court’s decision,
nevertheless to be substantially more prejudicial than probative. Id.
           The trial court initially heard the evidence outside the presence of the jury, and
subsequently overruled the Appellant’s objections. The trial court found that the probative
value of the evidence of the assaults substantially outweighed the prejudicial effect. Further,
the trial court submitted a limiting instruction to the jury in its charge.


 It is presumed that
jurors follow the instructions set forth in the court’s charge. Hutch v. State, 922 S.W.2d 166,
172 (Tex. Crim. App. 1996).
           Indeed, the evidence of extraneous offenses was prejudicial. Almost all evidence
offered by the prosecution will be prejudicial to the defendant; however, Rule 403 excludes
only evidence that is unfairly prejudicial. Caballero v. State, 919 S.W.2d 919, 922 (Tex.
App.-- Houston [14th Dist.] 1996, pet. ref’d). When Rule 403 provides that evidence “‘may
be excluded if its probative value is substantially outweighed by the danger of unfair
prejudice,’” it simply means that trial courts should favor admission in close cases, in
keeping with the presumption of admissibility of relevant evidence. Montgomery, 810
S.W.2d at 389; Tex. R. Evid. 403.
           Appellant asserts the bad acts are too remote in time to the charged offense, but we
note that there is no per se rule as to when an extraneous offense is too remote in time to be
introduced into evidence. Corley v. State, 987 S.W.2d 615, 619-20 (Tex. App.--Austin 1999,
no pet.). While remoteness is a factor regarding the admission of the evidence, it is not a
chief factor and must be considered among all other relevant factors. Id. at 620-21. The
relevant criteria in determining whether the prejudice of an extraneous offense outweighs its
probative value include: (1) whether the ultimate issue was seriously contested by the
opponent of the extraneous offense evidence; (2) if the State had other convincing evidence 
to establish the ultimate issue to which the extraneous misconduct was relevant; (3) whether
the probative value of the misconduct evidence was not, either alone or in combination with
other evidence, particularly compelling; and (4) whether the misconduct was of such a nature
that a jury instruction to disregard would have not likely have been effective. Montgomery,
810 S.W.2d at 392-93. The extraneous offenses were strong evidence of the state of mind
as well as the relationship between the Appellant and the victim. The defense also put on its
own witnesses to testify to the nature of the relationship between the two. Specifically,
Thomas Fertic and Miguel Reyes both testified they never witnessed any abusive or
controlling type of behavior. The evidence was highly probative of the Appellant’s intent
to engage in the charged offences, and this intent was seriously contested at trial. The
evidence was compelling and there was no direct evidence aside from the autopsy evidence
directly proving the offense. The trial court is given wide latitude to admit or exclude
evidence of other crimes, wrongs, or acts. Id. at 390. As long as the trial court’s ruling was
within the zone of reasonable disagreement, we must not intercede. Id. at 391. We find that
the probative value of the evidence combined with the limiting instruction was not
substantially outweighed by the risk of unfair prejudice. We therefore find no abuse of
discretion in the trial court’s evidentiary ruling. Consequently, Issue Nos. Three and Four
are overruled in their entirety.
           In Issue Nos. Five and Six, Appellant contends that the trial court erred in admitting
the victim’s hearsay statements through Jennifer Roberts’s testimony. Specifically, in his
fifth issue, the Appellant contends the trial court erred in admitting the testimony to the effect
that the deceased told the witness that the Appellant had assaulted her. In Issue No. Six,
Appellant alleges that the trial court erred in admitting hearsay testimony to the effect that
the deceased had told Roberts that she did not want to leave the Appellant.
           As stated, Jennifer Roberts testified that in November of 1997, she found the victim
bloodied, bruised, and injured in Roberts’s child’s bedroom where the victim and Appellant
had spent the night. While the room had been immaculately clean the night before, the room
was then in a shambles. The shelf was hanging off the wall, there was blood on the walls,
the curtains were ripped of the wall, and the sheets were off of the bed. Jennifer woke the
victim and she began to cry. Roberts testified that the victim was upset, hurt, scared, and
traumatized. Prior to Roberts stating what the victim told her, Appellant objected to any
hearsay statements. Appellant did not lodge any confrontation clause or due process
objection. The State responded that the statement was an excited utterance, and the court
overruled the objection.
           Roberts then testified that the victim told her that Appellant had beaten her. The
victim then stated that she was afraid to leave Appellant. Appellant then objected on the
ground of hearsay, and the State responded that the statement was encompassed by the prior
excited utterance ruling. The court responded that the State had not established whether the
statement was part of the conversation or simply Roberts’s assumption. The State elicited
that the two had a ten-minute conversation and then Roberts tried to push the victim out the
window to escape Appellant. The victim stated that she did not want to leave Appellant and
gave no further explanation as to why she did not want to leave.
           A court’s ruling on the admissibility of an out-of-court statement as being an
exception to the hearsay rule is reviewed on an abuse of discretion standard. Zuliani v. State,
97 S.W.3d 589, 595 (Tex. Crim. App. 2003). The trial court does not abuse its discretion
unless the ruling lies outside of the zone of reasonable disagreement. Id.
           Initially, we note that to the extent Appellant is raising a confrontation clause or due
process issue, he has failed to preserve such issues on appeal. Because Appellant objected
only on the basis of hearsay, and did not raise any potential confrontation clause or due
process violations at the trial court level, we do not address those issues. See Tex. R. App.
P. 33.1; Bunton v. State, 136 S.W.3d 355, 369 (Tex. App.--Austin 2004, pet. ref’d); Crawford
v. State, 139 S.W.3d 462, 464 (Tex. App.--Dallas 2004, pet. ref’d). Hearsay objections and
confrontation clause objections are “neither synonymous nor necessarily coextensive.” 
Bunton, 136 S.W.3d at 368. Accordingly, we will only assess the hearsay contention.



           Hearsay is a statement, other than one made by the declarant while testifying at a trial
or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid.
801(d). For hearsay to be admissible, it must fit into an exception provided by a statute or
the rules of evidence. Tex. R. Evid. 802. One such exception is that for excited utterances. 
Tex. R. Evid. 803(2). An excited utterance is “a statement relating to a startling event or
condition made while the declarant was under the stress of excitement caused by the event
or condition.” Id.; Salazar v. State, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). In
determining whether a hearsay statement is admissible as an excited utterance, the ultimate
inquiry is “whether the declarant was still dominated by the emotions, excitement, fear, or
pain of the event or condition” when the statement was made. Apolinar v. State, 155 S.W.3d
184, 186-87 (Tex. Crim. App. 2005). The court may consider factors such as “the length of
time between the occurrence and the statement, the nature of the declarant, whether the
statement is made in response to a question, and whether the statement is self-serving.” Id.
at 187. However, no single factor is dispositive, but merely bears on our ultimate
determination. See Lawton v. State, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995); Penry v.
State, 903 S.W.2d 715, 750-51 (Tex. Crim. App. 1995).
           In the present case, the record reflects that Jennifer Roberts went to bed and awoke
the next morning to find the victim bloodied and bruised, crumpled on the floor, naked, and
wrapped in a comforter. The room was in a shambles. The victim upon awakening, started
to cry; she was hurt, upset, scared, and traumatized. Clearly, the trial court could have found
that the victim was still dominated by the emotions of what had happened to her. Her
statement related to the startling event and was not the result of reflection. We find that the
trial court did not abuse its discretion in admitting the statement that the Appellant had beaten
the victim. See Salazar, 38 S.W.3d at 154.
           Regarding the contention raised in Issue No. Six concerning the victim’s statement
that she did not want to leave Appellant, we find that Appellant has failed to preserve this
contention on appeal. As stated, the trial court did not rule on Appellant’s hearsay objection
but stated that the State needed to establish whether or not the statement was part of the same
conversation or an assumption made by Roberts. In order to preserve error, if any, a
defendant must timely and specifically object, obtain an adverse ruling, and if he does so, he
must request an instruction to disregard and move for a mistrial. Mock v. State, 848 S.W.2d
215, 220 (Tex. App.--El Paso 1992, pet. ref’d). Here, the court did not rule on Appellant’s
objection, and even if the court’s statement could be considered to sustain Appellant’s
objection, Appellant did not request an instruction to disregard or a mistrial. Issue Nos. Five
and Six are overruled.
           Having overruled each of Appellant’s issues on review, we affirm the judgment of the
trial court.
                                                                  RICHARD BARAJAS, Chief Justice

June 1, 2006

Before Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)