

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00194-CR

SHARON ANNE MAXWELL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 16,037

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

From the time Gordon Lynn Maxwell's charred body was discovered in his partially burned truck in his backyard, until the conviction[1] of Sharon Anne Maxwell for the murder of Gordon, her tenth husband, Maxwell[2] furnished authorities at least three different narratives to explain Gordon's death. We affirm the trial court's judgment because (1) sufficient evidence supports Maxwell's conviction, (2) admitting evidence of Maxwell's recent contacts with Stroman and Campbell was within the trial court's discretion, (3) admitting evidence of the biting incident was harmless, (4) admitting French's testimony was harmless, (5) denying Maxwell a continuance was not harmful error, and (6) no error in admitting the hearsay portions of Mullins' investigative report was preserved.

### (1) Sufficient Evidence Supports Maxwell's Conviction

On August 30, 2011, Maxwell placed a frantic 9-1-1 telephone call. She told the dispatcher that she could not locate her husband, his truck was "on fire in the backyard," and bullets were exploding inside the truck. When Christopher Maxwell, Gordon's brother and a volunteer firefighter, arrived on the scene, he noticed smoke coming from behind the Maxwell home. He ran to the backyard, climbed on the porch, and knocked on the locked back door. The door was answered by Maxwell who "had a towel around her head like she had just got out of the shower," and by her son, James Potter, who looked like he "kind of just woke up" because he was wearing pajama pants, no shoes, and no shirt.

---

[1]Maxwell was sentenced to life imprisonment and ordered to pay a $10,000.00 fine.

[2]All references to Maxwell are to Sharon, and we refer to Gordon Maxwell as Gordon.

The fire department responded and extinguished the fire. Investigator Mark Moore testified that a body, burned beyond recognition, was "located in the floorboard" in the front of the truck along with "numerous shell casings." Because the floorboard in the rear passenger compartment contained unburned "paper products, several magazines and books all behind the seat area," Moore concluded that "flames were coming from the front of the vehicle towards the back." Moore walked a canine around the scene. The dog made "multiple" positive alerts, suggesting use of accelerants in the fire. Emerald Nazareno, a forensic scientist at the State Fire Marshal's Office Forensic Arson Laboratory, tested samples taken from the front floorboard of the truck and confirmed the presence of gasoline. He testified that the clothing found on the body had also been doused with gasoline.

Moore testified that he found "several red plastic containers that had gasoline written on them," including one container that was burned on the side with "liquid that . . . was coming out of the can." He smelled gasoline around the area. He also noticed that bedding was located in the truck and strewn on the back porch of the home.

Noticing these details, Investigator David Cruce asked Maxwell for consent to search her home. Although her family encouraged her to give consent, Maxwell refused. Cruce testified that Maxwell voluntarily followed officers to the Upshur County Sheriff's Department office to give her first statement, while he sought a warrant to search the house. During this first August 30, 2011, statement, Maxwell denied any involvement in Gordon's death and claimed that, although this was her tenth marriage, Gordon, who was her high school sweetheart, was her "fairytale." She described the marriage as normal and denied any abuse on his part.

3

Maxwell told Cruce that the "last time she saw her husband he had gone outside to work on his truck" because "maybe something was wrong with the fuse box." Maxwell said she was in the shower, heard the honk of a horn, climbed out of the shower to investigate, and discovered the truck was engulfed in flames. She woke her nineteen-year-old son, James, who was recovering from kidney surgery and who, according to Maxwell, was in a deep sleep due to the pain medication he was taking. Maxwell claimed that, as she approached the truck and called 9-1-1, bullets began flying past her. Cruce was perplexed by this statement because of his belief that bullets do not simply explode in fires. Given Maxwell's great delays in answering simple questions, her lack of emotion, and scratch marks on her legs that Cruce thought may have been caused by her going into the woods to dispose of the murder weapon, Cruce suspected Maxwell was lying to him.

As Maxwell was giving her first statement, Chris McCauley and Chase Mullins received a warrant to search the Maxwell house and began processing the scene. As McCauley took photographs of the inside of the residence, he noticed "something on the wall that appeared to be a blood stain or blood spatter around the headboard" in the master bedroom. Mullins saw what he believed was blood on the ceiling. Bedding—including "a maroon comforter as well as additional maroon items of bedding . . . three pillow cases, a pillow roll, a fitted bed sheet, a flat bed sheet, and a bed skirt," apparently stripped from the bed—was found by Detective Dan Registad inside a black trash bag. Registad found cleaning supplies on the kitchen counter and the top to a Pine-Sol bottle inside the washing machine. Registad and Mullins concluded that "a cleanup had taken place." After observing the scene in the master bedroom, Registad concluded

4

that "an extreme amount of force [was] applied to something with blood" given the "mostly high velocity" blood on the headboard. McCauley recalled that the master bedroom closet contained several dusty .22 rifles that had not been shot recently, boxes of ammunition, and a gun box for a never-recovered .22 caliber revolver with a 6.5 inch barrel.[3]

The results of the initial investigation by McCauley, Mullins, and Registad were immediately reported to Cruce during Maxwell's August 30 interview. When faced with those findings, Maxwell quickly changed her story. She told investigators that Gordon got "irate about everything -- didn't matter what it was" and would go "crazy sometimes." She said, "I loved him with all my heart. And I think he loved me with all his, but he had such a strange way of showing it -- I don't know, he had such a -- a control thing." Maxwell claimed that, earlier on the day of Gordon's death, Gordon had tried to kill her. She testified, "He had the gun in my mouth and he told me he was gonna blow my brains out." "Then I got the gun out of my mouth and I hit it, whatever. You know (unintelligible). But the gun went off -- I don't know what happened." Gordon was shot four times with his never-recovered .22 caliber revolver.[4] Maxwell said, "I didn't want him to hurt me again," but claimed she did not intentionally shoot him. Next, she admitted that she dragged Gordon's body out of the house using a blanket, put his body in the truck, "poured gasoline in the engine compartment and inside the cab of the truck" on the body, and "set the truck on fire." She stated that James was asleep during this time.

---

[3]A .375 caliber pistol with a spent shell was also recovered from under the bed. According to Registad, the hammer of this gun was cocked and ready to be fired. Maxwell told investigators that this was her weapon.

[4]Cruce opined that Maxwell could have received the scratches on her legs in an attempt to hide the weapon in briars or bushes.

Lynn Salzberger conducted an autopsy and confirmed from dental records that the "severely burned or charred" body recovered from the truck was Gordon. She testified that Gordon had suffered four gunshot wounds to the head and determined the cause of death was "homicidal violence including multiple gunshot wounds."[5] Gloriz Ruiz, a Texas Department of Public Safety Crime Laboratory forensic scientist, testified that the blood swabs collected from the master bedroom had, "[t]o a reasonable degree of scientific certainty," come from Gordon.

James Jeffress, a forensic scientist in the "fireman and tool mark section at the Texas Department of Public Safety Crime Laboratory," testified that four bullets "removed from the skull of the head of the victim" were consistent with .22 caliber ammunition that could be "fired from a revolver, pistol, or rifle." Jeffress said there was no way to accidentally shoot a revolver four times, because the trigger would have to be pulled four times. Cruce agreed.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of murder beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

---

[5]Salzberger added that, "if a person is alive at the time of a fire that soot or smoke will be deposited on the surface of the airway" and that, because "Mr. Maxwell did not have any soot in his airway," he was killed before the fire.

facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* Maxwell committed the offense of murder if she intentionally or knowingly caused Gordon's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

Maxwell incorrectly argues that there is no evidence she pulled the trigger that killed Gordon. This argument stems from another change in Maxwell's testimony suggesting that James was the shooter. This change in testimony, however, took place after several jailhouse calls to one of her ex-husbands. On September 10, 2011, she told this ex-husband, "I didn't do it. I promise you that. This is crazy." Maxwell claimed, "[Gordon] went beserk. I told you he was crazy before," and again denied James' involvement. She said, "They better reduce it to accident. That's what it was." Maxwell and this ex-husband professed their love for one another on the telephone, and he agreed to assist her due to his belief that she was defending herself from Gordon.

On September 18, 2011, Maxwell was informed over the telephone by her ex-husband that the autopsy results revealed Gordon had been shot four times. He seemed concerned and confused and again asked if James was involved. Maxwell maintained, at that time, that James

7

was uninvolved. In a January 3, 2012, call, the ex-husband presented Maxwell with details of the investigation that had been disclosed publically. Convinced that James was the shooter, he told Maxwell, "They all think James done that. If James done that he's got to route his own heat." He warned Maxwell of the consequences she would face if she was protecting James and pleaded with her to "get [her] story straight." The jailhouse calls reveal that he wanted to reunite with Maxwell, if she was set free.

On March 6, 2012, Maxwell informed investigators that she wanted to set the record straight. She provided this narrative:

> At some point James came through the kitchen, and he went outside. He might not have been outside. He went through to the utility room. I don't know if he went all the way outside. The back door was open, and he came back through. I guess he was going to his room. He was mumbling to himself, I'm not sure what he said . . . . The next thing I know I was in the kitchen area and I heard a gunshot. It startled me and at first, I didn't realize what it was, and I thought, "oh my gosh, Gordon." So I went back to the bedroom door, and I saw Gordon on the bed, and there was blood on his head or something, it looked like. I backed up, and I told James something about putting a bag under him or something. I don't know what I said. I backed up in the kitchen, and just . . . I didn't know what to do. I was scared to death.

She also discussed what happened after the shooting:

> [I] couldn't look at Gordon. I told James to put a bag around him. I couldn't look at him . . . I don't know, I just . . . James had, he was trying, he was crying, he was upset. I was a mess. I remember dragging him off the bed . . . oh God . . . And I was telling James to help me. James, he tried. He was crying, bent over . . . I got to, I guess the utility room maybe. I'm not sure where I stopped at. Then I pulled the truck up to the edge of the house . . . I don't know. Then I remember we were across the back porch, and I told James to help me. He was hung on a nail or something was sticking up. He tried to help me get it loose . . . I'm not, I was crossing the grass area and into the truck, and . . . I was, pulled up into the truck. James had tried to help me. He wasn't much help. My shoulder's pretty bad . . . oh gosh . . . I remember, like you know, stuffing him around in the blanket and in the bag or whatever it was, I don't know. I don't know what it

8

was. At that point I backed the truck up and came back outside, threw the stuff in the house. Put it all in the bag, and I told James to help me stick it up in the attic . . . So he helped me, or I helped him, or I don't remember, but we got it up in there . . . Backed the truck up . . . Gosh I was just . . . There were gas jugs sitting over by the shed. I poured some in the motor and across the seat. There was something, I can't remember, it said flamboyant [sic]. I don't know, I don't know where it come from. You know I opened it and dumped it. I couldn't look at Gordon. 1 don't know, I just nuh uh. This whole thing's . . . When I turned around and I was going to put the gas jug up . . . I didn't light the fire. I don't know if James did it or it caught on fire, I don't know. I remember a "whoosh," and then I went back in the house . . . And I was so . . . we took the house phone to call 9-1-1, and of course I tried to dial it and it wouldn't dial. . . . I grabbed my phone which was on the nightstand and called 9-1-1. I told them the truck was on fire and all that . . . . At some point I think I washed my face and arms or something, I don't know.

Maxwell reiterated that Gordon "was abusive" and "would get really angry at different times." She claimed Gordon did not want James living in the house, and his dislike of James led to arguments that left her with bruises. Maxwell told the officers, "If Gordon said anything to James it was rude." She added, "I guess you could say Gordon hated James and James hated Gordon, in my point of view." She explained that she didn't call 9-1-1 immediately because she was trying to save her son.

However, in addition to Maxwell's earlier statement denying her son's involvement, other evidence elicited could have led the jury to conclude that James was not the murderer. James told Cruce that Maxwell knocked on his door and woke him up,[6] that Gordon was "a real calm and a good natured guy," that "there did not appear to be any problems between his mother

---

[6]Gordon's brother Christopher also testified that James appeared to have just been awakened when he answered the door. Christoper testified that James was not sweating at the time.

9

and Gordon," and that "he never saw violence in the home."[7]  James testified at trial that Maxwell "was screaming and the truck was on fire, everything had already happened" when she woke him.  He correctly pointed out that Maxwell is heard on the 9-1-1 call referring to him and stating, "[H]e was asleep.  I just woke him up."  James told the jury that Maxwell would often manipulate men for money and claimed that she was having multiple affairs while she was married to Gordon.  James said Maxwell had threatened him with a gun more than one time.

James' medical records confirmed that he had chronic kidney disease and had undergone a kidney stent placement the week of Gordon's death.  He went to the hospital by ambulance immediately after the incident.  His medical records stated,

> Patient had kidney surgery with stent placement for kidney failure . . . . Family vehicle was on fire in the backyard.  He got out of bed to assist his mother and upon doing so overexerted himself.  He was supposed to remain in bed for rest and rehab following this surgery. . . .

James' stepbrother, William Eric Potter,[8] testified that James first told him that Maxwell shot Gordon, but later claimed that he did the crime.  James denied telling Potter that he shot Gordon.  After extensive questioning, Cruce dismissed James as a suspect.  The jury, as the finder of fact, was also free to conclude that James was not the killer, especially given Maxwell's

---

[7]Mullins testified that Maxwell's other sons, Aaron and Timothy Henderson, also said that Gordon was "[an] outstanding individual," that they loved and respected him, and that they knew of no problems between Gordon and Maxwell.  Rhonda Maxwell, who had been married to Gordon for sixteen years, testified that he had never abused or threatened her.

[8]Potter described his extensive criminal background as a "long list," which included "anything you can think of basically."  William had been convicted of deadly conduct involving a firearm, discharging a firearm, evading arrest with a motor vehicle, evading arrest on foot, assault, assault of a public servant, multiple thefts, unauthorized use of a vehicle, possession of marihuana and other drugs.  He admitted that warrants had been issued for his arrest on the week of his testimony and that arrangements had been made to dismiss the warrants in exchange for his testimony.

earlier statements and James' physical condition.  We find the evidence sufficient for a rational fact-finder to conclude, beyond a reasonable doubt, that Maxwell shot Gordon.

Maxwell also argues that she had no intent to kill Gordon, based on the fact that the shooting was accidental.  Intent to kill, however, can be inferred from the circumstances surrounding the use of a deadly weapon, "the acts, words, and conduct of the accused," and "the extent of the injuries." *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *see Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986) (pulling loaded revolver and aiming it at two officers sufficient to establish intent to kill).  The jury heard testimony from investigators and forensic scientists that shooting Gordon four times could not be an accident.  Instead of initially calling 9-1-1 for assistance, there was evidence that Maxwell drug Gordon's body through the house, pulled him across the back porch using a comforter, and placed him inside of his vehicle.  Per her own admissions, she next doused the body and the vehicle with gasoline and threw bullets into the car.  Investigators believed that Maxwell tried to cleanse the scene and hid the murder weapon in the woods.  She called 9-1-1 after the truck was burning and claimed she could not put the fire out because bullets were flying past her.  Given these facts, the jury could find the crime was intentionally committed.

The evidence is legally sufficient to support Maxwell's conviction.

*(2)*     *Admitting Evidence of Maxwell's Recent Contacts with Stroman and Campbell Was Within the Trial Court's Discretion*

The State informed the trial court of its intent to call witnesses Joseph Adam Stroman and Rusty Campbell, two of Maxwell's former lovers.  Because Maxwell's defense at trial was that James was the shooter, the State "move[d] to offer through rebuttal testimony . . . [that] there

11

were extramarital affairs that she was having, that she was sleeping with several other men," and that she had once bitten a man that tried to leave her. The State argued it was "important to show the state of mind of the accused" because "we believe [Gordon] was leaving and walking out the door. Based on our theory of the case that's why she shot and killed him." While arguing why the trial court should allow testimony of the affairs and the biting incident, the State said,

> In addition there were other men including ex-husbands that she was talking to during this time period. This is important to show the state of mind of the accused for this reason, we have designated an expert and provided a letter report to [Maxwell's counsel] that Dr. Wade French would state that she fits the category of a borderline personality disorder and based on those types of individuals the fear of abandonment or rejection would be very relevant to their state of mind and could cause them to flip and including killing another person.

Maxwell complained that admission of the testimony would violate Rule 404:[9]

> (a)      Character Evidence Generally. Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
>    (1)   Character of accused. Evidence of a pertinent character trait offered:
>
>       (A)   by an accused in a criminal case, or by the prosecution to rebut the same
>
>       . . . .
>
> (b)      Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that on timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in

---

[9]While Maxwell also argued at trial that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury, this issue was not included in Maxwell's brief and will not be addressed. *See* TEX. R. EVID. 403.

12

the State's case-in-chief such evidence other than that arising in the same transaction.

TEX. R. EVID. 404. Specifically, Maxwell argued that this evidence should not be admitted under Rule 404(a) because the defense had not argued that she was a good wife, and the evidence did not rebut the argument that James committed the crime.

The trial court admitted the evidence.[10] Stroman testified to having had an affair with Maxwell in 2009, punctuated unpleasantly with a biting incident, which is discussed later. Despite the biting experience, Stroman returned to Maxwell. He received a telephone call from her in April or May 2011 in which Maxwell told Stroman that "she had married Gordon and that she wasn't happy." Stroman testified that he had "a sexual encounter" with her August 15, 2011, "two weeks and one day before she committed the crime." A week after the encounter, Maxwell told Stroman that "Gordon was watching her phone. She had to be careful."

Campbell testified that he was twice married to and divorced from Maxwell. She continued to contact him after their divorces, and the two kept in touch. Campbell testified that he and Maxwell spoke several times in August 2011 before the murder.[11]

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). A trial court does not abuse its discretion so long as the decision to admit evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App.

---

[10]The court also granted Maxwell a running objection to the evidence.

[11]There was evidence, which was unobjected to, suggesting that Gordon was experiencing marital problems. His co-worker, Billy Robert Harmon, testified that Gordon reported having problems at home shortly before the murder and that he cried when Harmon suggested that Gordon should consider leaving Maxwell. Harmon testified that Gordon "was somewhat depressed . . . his attitude changed, [he] wasn't as talkative and as lively as he had been."

13

1990) (op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

If the opponent of proffered evidence objects that the evidence constitutes an extraneous offense, "the proponent must satisfy the trial court that the extraneous offense evidence has relevance apart from its character conformity value." *Santellan v. State*, 939 S.W.2d 155, 168 (Tex. Crim. App. 1997). Article 38.36 of the Texas Code of Criminal Procedure provides,

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (West 2005).

Further, evidence of other bad acts are admissible to show motive and absence of mistake. TEX. R. EVID. 404(b). Although motive is not itself an element of a crime, it is relevant because it tends to make it more likely that the accused committed the crime. *Massey v. State*, 933 S.W.2d 141, 154 (Tex. Crim. App. 1996); *see, e.g.*, *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (appellant's affair "demonstrated that the appellant had a motive to kill his wife"); *Temple v. State*, 342 S.W.3d 572, 585 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013) (evidence of defendant's affair during marriage may provide motive for murder of spouse).

In this case, the jury had heard Maxwell's claim that she shot Gordon accidentally and had no intent to shoot him. Maxwell had also claimed that her marriage to Gordon was a fairytale and that James was the shooter. We conclude that the trial court was within its

14

discretion to admit the testimony of the affairs, including Maxwell's recent sexual encounter with Stroman and her communications with Campbell, to rebut these theories, i.e., for the limited purpose[12] of showing an absence of mistake or accident and motive to kill. *See Reaves v. State*, 970 S.W.2d 111, 118 (Tex. App.—Dallas 1998, no pet.) (addressing Texas Rules of Evidence 401 and 403 only, but holding evidence of wife's extramarital affair admissible to show motive to kill husband and rebut claim of self-defense).

*(3)    Admitting Evidence of the Biting Incident Was Harmless*

Part of Stroman's testimony, however, was of questionable relevance and rather remote in time. Stroman testified that, during his affair with Maxwell in 2009, he tried to break up with her, creating a strong response from her. Stroman was driving when he noticed Maxwell following him in her vehicle. He testified, "I finally got out of my truck and I locked my doors so she couldn't get in, got her calmed down, and we sat down in her vehicle and I was trying to tell her, you know, this is -- this ain't going to work with us, [I'm] going home to my wife." Stroman said that, on hearing his news, Maxwell "jumped over and she planted her teeth in my arm, [and] bit me." He "drug her out through the passenger side" while "she was still biting [his]

---

[12]The court issued the following limiting instruction to the jury:

> Members of the jury, regarding the testimony concerning the defendant's involvement in another act you cannot consider such testimony for any purpose unless you first find from the testimony presented beyond a reasonable doubt that the defendant committed these other acts, if any. . . . Further, . . . you may only consider this testimony as it may aid you, if it does, in rebutting a defensive theory in this case and not for character conformity.

15

arm." He told the jury, "I couldn't get her off of me,"[13] and showed them the teeth marks on his arm which were still visible.

Maxwell argued that the biting incident was too attenuated in time to be considered. We find that no reason was advanced by the State explaining admissibility of the biting incident except to show that Maxwell could "flip." In other words, the State specifically sought to offer this testimony to show an action in conformity with a propensity for violence—an inadmissible purpose.

Although the State did not meet its burden to demonstrate that the biting incident had any relevance beyond character conformity, we conclude that its admission was harmless. The erroneous admission of an extraneous offense does not constitute constitutional error. *Higginbotham v. State*, 356 S.W.3d 584, 592 (Tex. App.—Texarkana 2011, pet. ref'd) (citing *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007)). Because it is not a constitutional error, it must be disregarded unless it affects a substantial right of the accused. TEX. R. APP. P. 44.2(b). An error affects a substantial right when it has a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). If the error had no influence or only a slight influence on the verdict, it is harmless. *Higginbottham*, 356 S.W.3d at 592 (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

In assessing the likelihood that the jury's decision was adversely affected by the error, we "consider everything in the record, including any testimony or physical evidence admitted for the

---

[13]Stroman reported the incident to a police officer.

16

jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). We may also consider the jury instruction given by the trial judge, the State's theory, any defensive theories, closing arguments, and even voir dire, if material to Maxwell's claim. *Id.*

We begin by noting that "extraneous-offense evidence is 'inherently prejudicial, tends to confuse the issues, and forces the accused to defend himself against charges not part of the present case against him.'" *Higginbotham*, 356 S.W.3d at 593 (quoting *Sims v. State*, 273 S.W.3d 291, 294–95 (Tex. Crim. App. 2008); *Pollard v. State*, 255 S.W.3d 184, 187–88 (Tex. App.—San Antonio 2008), *aff'd*, 277 S.W.3d 25 (Tex. Crim. App. 2009)). "By its very nature, an improperly admitted extraneous offense tends to be harmful. It encourages a jury to base its decisions on character conformity, rather than evidence that the defendant committed the offense with which he or she has been charged." *Id.* (quoting *Jackson v. State*, 320 S.W.3d 873, 889 (Tex. App.—Texarkana 2010, pet. ref'd)). This factor favors a finding of harm.

The other factors, however, overwhelmingly lead to the conclusion that harm did not result from the admission of this evidence. The testimony of the biting incident consumed only two pages out of "over 1150 pages of actual testimony plus numerous exhibit volumes." The evidence of Maxwell's guilt, including her testimony, was strong. It would be quite a leap for a rational jury to believe that a person would be capable of shooting someone and burning his body simply because they were capable of biting someone some two years earlier. This incident contributed nothing to the theories of either party since Maxwell's assault of Stroman several

17

years ago would not establish that the shooting was committed by someone else, that it was an accident, or that it provided motive or intent to kill. The incident was mentioned during the closing argument, but the trial court instructed the jury not to consider any bad act for the purpose of character conformity. "Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial[,]" and appellate courts "generally presume that a jury will follow the judge's instructions." *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

Considering the entire record, we conclude that admission of the biting incident did not have a substantial and injurious effect or influence on the jury's verdict. We overrule this point of error.

*(4)     Admitting French's Testimony Was Harmless*

Over Maxwell's objections, citing irrelevance and Rules 403 and 703 of the Texas Rules of Evidence, the State sought to admit testimony from Dr. Wade French, a licensed professional counselor. The State explained that "Dr. Wade French would state that [Maxwell] fits the category of a borderline personality disorder and based on those types of individuals the fear of abandonment or rejection would be very relevant to their state of mind and could cause them to flip and including killing another person." French had not examined Maxwell, but the State believed that his testimony regarding borderline personality disorder, a diagnosis which Maxwell did not have, would be helpful to the jury.[14] After a brief voir dire examination conducted outside of the presence of the jury, Maxwell's counsel argued,

---

[14] Specifically, the State argued,

18

[T]he [S]tate's trying to admit evidence as far as memory in general and diagnosis in general, but there's no -- he's up here as an expert. He's going to testify about memory. He's going to -- if he follows the letter he's going to testify that he doesn't believe that, you know, the statements she made about her memory and not being able to remember stuff are valid. He talks about borderline personality disorder and although he's not going to diagnose it with her, he wants to testify about borderline personality disorder and I think that is far too prejudicial. He's not qualified as an expert. As far as the *Kelly* challenge, you know, *Daubert* obviously he's got no testimony about the underlying scientific theory being valid. He can't testify about it being applied validly in this case because it wasn't, and I would object any testimony he has because there's nothing he can help the jury with in this particular case.

The State assured, "We're not going to ask him to diagnose this defendant. We never have. He was never hired as that." The trial court stated it would "allow the witness to testify in general terms as to what type of people . . . that he would diagnose as having borderline personality disorders, but not specially this defendant."

French testified, "[W]hen you have multiple marriages then that's generally an indication of some—some type of instability," and usually the instability falls "within what we refer to as personality disorders." He claimed that people with the disorder are not capable of following through with commitments for a long period of time and "seem to get bored easily and then start seeking stimulation," which behavior can include extramarital relationships. French said, "The cardinal feature . . . is a chronic fear and excessive reaction to abandonment. Within individuals

---

Based on the evidence that's been admitted we advised the Court yesterday one possible motive, there's several the jury can pick from in this case, but one very likely motive is the motive of the relationship dysfunctions that she's exhibited that's now before the jury, that's not speculation. Number two, the fact that if an individual that shows these characteristics in relationships like this and when they are ended by the other individual, people that fit these categories act out in anger and rage. . . . It will aid this jury understanding why that is relevant and important for them to understand. Plus the videos, the gap in time of her looking up at the ceiling, her memory loss. The memory doesn't work that way. Memory is constantly rolling and imprinting and encoding in our brain. Dr. French would testify to such matters.

19

with borderline personality disorders you don't leave them, they leave you." French told the jury, "People with borderline personality disorders, they have difficulties with rapid shifting of mood, they go from happy to rage, full anger very quickly and often without very much provocation at least as you would observe what happens. So their response to what they perceive as provocation is often way in excess of the situation itself." He explained that, when someone tries to leave another with this disorder, "it provokes an anger that goes beyond anger, it's almost a blind rage." Over additional objection, French concluded that Gordon's murder could have been an act of rage, an opinion which was deduced from watching video recordings of Maxwell's interviews.

The trial court may admit expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. For the testimony to be admissible, the proponent of expert testimony must establish that (1) the expert is qualified to render an opinion on the subject matter and (2) the testimony is relevant and based on a reliable foundation. *Id.*; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). The proponent of the scientific evidence has the burden of demonstrating by clear and convincing evidence that the evidence is reliable. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). Expert testimony is unreliable if it is not grounded "in the methods and procedures of science" and is no more than "subjective belief or unsupported speculation." *Robinson*, 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)).

20

In evaluating expert testimony, "the trial court must determine whether the expert 'make[s] an effort to tie pertinent facts of the case to the scientific principles which are the subject of his testimony.'" *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000) (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)). "Restated, the testimony must be 'sufficiently tied to the facts to meet the simple requirement that it be "helpful" to the jury.'" *Id.* (quoting *Jordan*, 928 S.W.2d at 555). If the expert does not tie the facts to his expert testimony, the testimony is neither helpful nor admissible. *See Mata v. State*, 46 S.W.3d 902, 915–17 (Tex. Crim. App. 2001); *Griffith v. State*, 983 S.W.2d 282, 287–88 (Tex. Crim. App. 1998); *see also Rousseau v. State*, 855 S.W.2d 666, 686 (Tex. Crim. App. 1993).

In this case, French described the lengthy process it takes to diagnose someone and stated that he could not diagnose Maxwell because he had not examined her. He also testified that there are ten different types of personality disorders. For this reason, the State emphasized that French was not hired to diagnose Maxwell, but rather, to speak in generalities. To the extent French was testifying generally about personality disorders that Maxwell had never been diagnosed as possessing, we find the testimony was not sufficiently tied to the facts in a manner to be helpful to the jury. Despite his claims that he could not diagnose Maxwell, French testified that, after watching Maxwell's interviews, Gordon's murder could have been the result of rage caused by one of these personality disorders. This testimony was merely speculative and, thus, unreliable and inadmissible.

The State used this testimony in closing argument, reminding the jury, "What did Dr. French testify to? Borderline personality disorders, they will flip in a moment's notice. They will leave you, but by God, you won't leave them. You won't leave them." This was error. Given the strength of the evidence in this case supporting Maxwell's conviction and the fact that French's testimony was less than fifteen pages long, however, we find that the error did not have a substantial and injurious effect or influence on the jury's verdict. Accordingly, we overrule this point of error.

*(5)* *Denying Maxwell a Continuance Was Not Harmful Error*

On the day of trial, August 20, 2012, Maxwell sought a continuance to have more time to locate potential witnesses who were identified in a sheriff's report that was given to counsel on the "eve of trial." The report recalled an exchange occurring when David Cruce and Chris Clark interviewed Potter. The report contained the following statements:

- William "said basically James told him that Gordon had been beating up on his mom, and had threatened her with a gun. He advised James said that Sharon did all that."

- William "advised James said she shot Gordon, and I guess drug him somewhere. William advised James said that he heard a bunch of commotion, and then he heard a gunshot, and that's when James ran in there."

- William's mother Diane Jeanette Perdue told investigators that her son Steven Purdue "advised that James admitted to killing Gordon Maxwell by shooting him four times in the face. I asked William if that was pretty much an accurate statement, and William nodded his head up, and down. I asked him if I could believe what his mother told me, and he said yea to an extent yea. I asked him if anything she said was wrong, and he said 'no to the places, the shots I guess, I mean I don't know.'"

- "Jeanette said . . . Steven advised that James admitted to killing Gordon Maxwell by shooting him four times in the face."

- "William advised . . . he was surprised when James admitted to killing Gordon."

22

- "I asked William if it seemed to bother James when he was telling of how he killed Gordon, and William said no. I asked William what James's reaction was, and did it seem to bother James when James admitted to shooting Gordon four times, to which William said not really, and that's why he really did not believe what he was saying."

The motion for continuance stated, "After the jury was empanelled . . ., Movant attempted all week to locate Diana Perdue, Steven Perdue, and William Eric Potter. Unbeknownst to Movant, Diana Perdue had moved and the address he had . . . was not any good." On appeal, Maxwell argues only that additional time was required to locate William.

At the hearing on the motion for continuance, the State argued that Diana Perdue's statement, claiming that William told her of James' statements had been "turned over . . . in the discovery December 23." Thus, the State claimed that Maxwell knew William could be a potential witness all along. It argued, "William Potter is the person the defense has known about. The defense has until this morning not even filed a subpoena request for him. He was on . . . the witnesses list for the defense." The State claimed it had sent by fax the report attached to the motion for continuance in January 2012. Maxwell's counsel claimed he did not receive any fax and argued it was "clearly unfair to the defense to have the most important exculpatory evidence in all the discovery to be withheld from us or not provided to us until, you know, [a] week after [the] jury has been selected." The motion for continuance was denied.

"A trial court's ruling on a motion for continuance is reviewed under an abuse of discretion standard." *Clay v. State*, 390 S.W.3d 1, 15 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007)). For Maxwell to establish an abuse of discretion, she must show that the trial court erred by denying her motion and that

23

she was harmed by the denial of a continuance. *Id.* (citing *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010)).

A first motion for continuance alleging the absence of a witness must show, among other things, "[t]he diligence which has been used to procure [the witness's] attendance" and "[t]he facts which are expected to be proved by the witness," which must "appear to the court" to be material.[15] TEX. CODE CRIM. PROC. ANN. art. 29.06(2), (3) (West 2006); *see Harrison v. State*, 187 S.W.3d 429, 434 (Tex. Crim. App. 2005). "Diligence, in the motion for continuance context, is the exercise of timely and persistent efforts to secure the attendance of witnesses, using the means and agencies provided by law." *Tucker v. State*, 109 S.W.3d 517, 520 (Tex. App.—Tyler 1999, pet. ref'd) (citing *Edwards v. State*, 185 S.W.2d 111, 112 (Tex. 1945)). "If defense counsel waits until only a few days before trial to seek to secure a witness for trial, the court may conclude that due diligence has not been used." *Id.* (citing *Norton v. State*, 564 S.W.2d 714, 716–17 (Tex. Crim. App. 1978)).

The trial court heard that Maxwell's counsel had known since December 23, 2011, of the existence of Perdue and her statement that William told her James shot Gordon. Counsel's statements establish that he did not attempt to locate William until after the jury had been seated even though William was included on Maxwell's witness list. Given this evidence, the court could find that due diligence was not exercised.

Also, to be successful on his or her motion, the defendant's attorney should "demonstrate the likelihood that the witness will be found within a reasonable amount of time." *Id.* (citing

---

[15]The report attached to the motion for continuance contained both inculpatory and exculpatory statements.

24

*Salinas v. State*, 542 S.W.2d 864, 866 (Tex. Crim. App. 1976)). Counsel was able to track down Perdue's family members through Perdue's last known address. Perdue's family members, however, were uncooperative in advising counsel of William's whereabouts. When it appears that the witness may be absent indefinitely, as was the case during the motion for continuance hearing, the trial court does not abuse its discretion by denying the continuance. *Id.*; *Salinas*, 542 S.W.2d at 866.

We find that the trial court was within its discretion to overrule the motion for continuance.[16] We overrule this point of error.

*(6)*     *No Error in Admitting the Hearsay Portions of Mullins' Investigative Report Was Preserved*

Maxwell's counsel questioned Mullins extensively during cross-examination with respect to the contents and omissions in his investigatory report. On re-direct examination, the State sought admission of the entire report during this exchange:

Q.     You wrote a report in this case, you recall that?

A.     Yes, sir.

Q.     Mr. Patton asked you a lot of questions about that report, did he not?

A.     Yes, sir.

Q.     Just now. I want to show you what I have marked as State's Exhibit 350.

THE COURT:  350.

Q.     350. You recognize State's Exhibit 350.

---

[16]Also, William was eventually located and testified at trial. Thus, the denial of the continuance would have been harmless if any error was shown.

25

A.     Yes, sir, this is my report.

Q.     Has a lot of evidence documented in it and your involvement in this investigation.

A.     That's correct.

Q.     This is what Mr. Patton was just asking you about, correct?

A.     Yes, sir.

[State's Attorney]:  Your Honor, I move to offer State's Exhibit 350 under rule 107, the rule of optional completeness.

THE COURT:  Any objection?

[State's Attorney]:  He's opened the door to it, Your Honor.

[Defense Attorney]:  Well, Your Honor, there's -- there's some hearsay statements in there that I would object to.

[State's Attorney]:  Well, Your Honor, that's why the rule is in place to go around the hearsay rule because he opened the door to only specific parts of the report, not it's [sic] entirety, and I have the opportunity to offer it under that rule.

[Defense Attorney]:  Your Honor, that doesn't get around the hearsay statements.  I mean, can ask him what's in the report that's been provided to me, but if there's inadmissible evidence in it that doesn't make this statement admissible.

THE COURT:  I'm going to overrule the objection[.]  350 is admitted.

"Hearsay statements are generally not admissible unless the statement falls within a recognized exception to the hearsay rule.  Rule 107, the rule of optional completeness, is one such rule."  *Mick v. State*, 256 S.W.3d 828, 831 (Tex. App.—Texarkana 2008, no pet.).  The Rule states,

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired

26

> into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as when a letter is read, all letters on the same subject between the same parties may be given.

TEX. R. EVID. 107. This rule of admissibility "permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party." *Mick*, 256 S.W.3d at 831 (quoting *Walters v. State*, 247 S.W.3d 204, 217–18 (Tex. Crim. App. 2007)). It is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing. *Id.* However, "Rule 107 does not permit the introduction of other similar, but inadmissible, evidence unless it is necessary to explain properly admitted evidence. Further, the rule is not invoked by the mere reference to a document, statement, or act." *Id.*

Where "appellant first raised the subject of [an officer's] report and questioned the witness as to special portions of its contents . . . it was permissible for the State to offer into evidence those portions of the report on the same subject." *Wintters v. State*, 616 S.W.2d 197, 202 (Tex. Crim. App. 1981). *Wintters* noted that the entire report was admitted, but concluded this was permissible because "Appellant's objection to the admission of [the officer's] report was directed toward the entire exhibit," "a general objection to an item of evidence, a part of which is admissible, is not sufficient to preserve an alleged error for review," and "Appellant had access to the report before the time it was offered into evidence and made no request that any portion of the report be deleted or covered." *Id.*

Here, our review of Maxwell's cross-examination reveals that the questions regarding the report were general, no reference was made with regard to specific statements in the report, and

no portion of the report was read to the jury. Thus, admission of the report based on the rule of optional completeness was not an option. *Grunsfeld v. State*, 813 S.W.2d 158, 163 (Tex. App.—Dallas 1991), *aff'd*, 843 S.W.2d 521 (Tex. Crim. App. 1992), *superseded by statute on other grounds*, Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 5.05, sec. 3(a), 1993 Tex. Gen. Laws 3586, 3759; *see Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004).

However, we must uphold the admission of evidence if it is correct under any theory of law applicable to the case. *Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010). The objection raised by Maxwell at trial was hearsay. A generalized hearsay objection to an exhibit may be properly overruled where it contains admissible evidence and there is no request to redact allegedly inadmissible portions. *Wintters*, 616 S.W.2d at 202; *see Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995); *Foster v. State*, 779 S.W.2d 845, 858 (Tex. Crim. App. 1989); *Ross v. State*, 154 S.W.3d 804, 813 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("The trial court is not required to sort through challenged evidence to segregate the admissible from the inadmissible."). Exhibit 350 is seventeen pages long. Maxwell's brief states, "The contents do include matters pertinent to respond under this doctrine, but the exhibit has many other items bolstering other evidence and not pertaining to the subject." The brief fails to identify any particular objectionable statement contained in the report.

Because Maxwell admits that certain portions of the report were admissible and that her objection at trial failed to direct the trial court to allegedly objectionable statements included therein, we cannot conclude that the trial court abused its discretion in admitting Mullins' report. We overrule this point of error.

28

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted: September 24, 2013
Date Decided: February 12, 2014

Do Not Publish